**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
                    *Plaintiff-Appellant,*

and

FRANCISCO G. SANTANA,
                    *Plaintiff,*                     No. 00-1507

v.

SEARS ROEBUCK AND COMPANY,
                    *Defendant-Appellee.*

FRANCISCO G. SANTANA,
                    *Plaintiff-Appellant,*

and

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,                                           No. 00-1509
                    *Plaintiff,*

v.

SEARS ROEBUCK AND COMPANY,
                    *Defendant-Appellee.*

Appeals from the United States District Court
for the Eastern District of North Carolina, at Greenville.
Malcolm J. Howard, District Judge.
(CA-98-136-4-H)

Argued: December 6, 2000

Decided: March 16, 2001

Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.

Reversed and remanded by published opinion. Judge Motz wrote the majority opinion, in which Judge Michael joined. Judge Niemeyer wrote a dissenting opinion.

**COUNSEL**

**ARGUED:** Robert John Gregory, Office of General Counsel, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Appellants. James Bernard Spears, Jr., HAYNSWORTH, BALDWIN, JOHNSON & GREAVES, L.L.C., Charlotte, North Carolina, for Appellee. **ON BRIEF:** C. Gregory Stewart, General Counsel, Philip B. Sklover, Associate General Counsel, Lorraine C. Davis, Assistant General Counsel, Lisa J. Banks, Office of General Counsel, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Appellants. Jerry H. Walters, Jr., HAYNSWORTH, BALDWIN, JOHNSON & GREAVES, L.L.C., Charlotte, North Carolina, for Appellee.

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

The Equal Employment Opportunity Commission (EEOC) brought this Title VII action on behalf of intervenor Francisco Santana, asserting that Sears Roebuck & Co. discriminated against Santana on the basis of national origin when it refused to hire him as a loss prevention associate. The district court granted summary judgment to Sears; Santana and the EEOC now appeal. For the reasons that follow, we reverse.

I.

Santana, born in Mexico in 1960, has olive skin and speaks with an Hispanic accent. He moved to this country in 1971 and has since

become a naturalized citizen of the United States. In 1979, after graduating from high school, Santana enlisted in the United States Marine Corps and has continually served as a Marine since that time.

During much of his adult life, Santana has also worked for Sears. In 1985, while he was stationed at a Marine base in Tustin, California, Sears hired Santana as a part-time loss prevention agent to provide undercover store security in its Costa Mesa, California store. Except for a one-year military leave of absence when he was stationed abroad, for the next ten years, Santana continued to work as a part-time loss prevention agent at the Costa Mesa store. In late 1995, the Marines transferred Santana to the Marine Corps Air Station in Cherry Point, North Carolina.

In preparation for this transfer in October 1995, Santana visited North Carolina. During his visit, Santana went to the Sears store in Morehead City, North Carolina to inquire about job opportunities for the same position he had held for ten years in California — specifically part-time loss prevention agent. Santana spoke with William Mansfield, the loss prevention manager in the Morehead City store. Mansfield assured Santana that the Morehead City store could use someone with his experience and that there would be a job waiting for him when he arrived. Mansfield then gave Santana a business card with the telephone number of the store's operations manager, Teri Katsekes, and said he would talk to Katsekes about Santana and his background and experience.

Upon his return to California, in November 1995, Santana asked the personnel department at the Costa Mesa Sears to send a transfer form to the personnel department at the Morehead City store. The Costa Mesa personnel department prepared the form, dated November 27, 1995, and forwarded it as requested. Santana contacted the Morehead City operations manager, Katsekes, by telephone, in November or early December, 1995. They had a brief conversation in which Santana told Katsekes that he would be available for work in North Carolina approximately the last week in December; she responded that they would be glad to have him in the North Carolina store and to get in touch with the store when he arrived.

In late December 1995, Santana reported for duty at the Marine base in Cherry Point, North Carolina. Shortly thereafter, he visited the

Sears store in Morehead City to inquire about starting work. Loss pre-
vention manager Mansfield told Santana that a job would not be
available until after the holidays. When Santana returned to the store
the first week in January, Mansfield again indicated that there were
no openings, so Santana completed an employment application, told
Mansfield he would continue to check back, and gave Mansfield his
address and telephone number. Santana returned to the store twice in
February but was unable to see either Mansfield or operations man-
ager Katsekes.

Periodically, throughout the spring and summer of 1996, Santana
returned to the Morehead City store to check on employment possibil-
ities. Santana submitted an additional employment application on
March 23, 1996. Although Santana made several attempts to talk with
Katsekes or Mansfield during this period, he was unable to speak with
either of them. On July 20, 1996, Santana submitted a third applica-
tion; in that application he indicated that he would accept a loss pre-
vention position or "any other position" with Sears. (At his
deposition, Santana identified copies of the March and July applica-
tions, which were submitted as exhibits in opposition to Sears's
motion for summary judgment.) Despite these efforts, Sears did not
contact Santana until October 1996.

In October, Patty Haynes, a human resources specialist at the
Morehead City store, telephoned Santana and invited him to come in
for an interview. During this interview, Haynes commented on San-
tana's accent and asked where he was "[o]riginally from." Santana
answered that he had been born in Mexico City. At the conclusion of
the interview, Haynes offered Santana a position as a stock clerk.
When Santana referred to his loss prevention experience, Haynes real-
ized that he was "the guy from California" and remembered his previ-
ous applications.

Haynes then took Santana to meet with Katsekes, who interviewed
him in the office of the store manager, Patricia Kiely; according to
Santana, Katsekes told him that Kiely was on vacation at the time.
Santana remembered this because Katsekes apologized for the messi-
ness of the desk during the interview, explaining that it was not her
office, where she normally conducted interviews, but that she was
"standing in" for store manager Kiely, using Kiely's desk, while Kiely

was on vacation. Santana maintains that, during the interview, Katsekes became increasingly disinterested and abrupt due to his accent, although she did not comment on the accent, as Haynes had. Nevertheless, at the conclusion of the interview, Katsekes offered Santana a part-time loss prevention position, sent him for a routine drug screening, and stated that he would begin work right after a satisfactory drug screening result was received. Two days later, on October 25, 1996, Santana underwent a drug screening test; the negative result was sent to Sears.

On November 1, 1996, Santana returned to the store to give Haynes a copy of his social security card and asked when he could begin work. Haynes told him that "the trainer was sick." When Santana demurred that he had been trained and worked for the company for ten years, she replied that company policy required retraining. A week later, on November 8, 1996, Santana telephoned Haynes, again inquiring when he could start work. Haynes told him that a background investigation was being conducted and that he would be called by November 12. During this time, Santana spoke twice with David Mrazick, the loss prevention manager who had replaced Mansfield; Mrazick indicated that there was an immediate need for someone in the loss prevention department, that he was impressed by Santana's experience, and that he would speak to "management" on Santana's behalf.

Despite this, no one at Sears contacted Santana about starting work. When Santana did not hear from Sears, he telephoned the store repeatedly; he also contacted Sears loss prevention officials in California, including that region's manager, to see if they could determine the reason for the delay. After these telephone calls failed to yield an answer, on November 22, Santana went to the store to speak with Haynes or Katsekes; Haynes saw him and told him Katsekes would telephone him by November 26. On November 27, after Santana had not heard from Katsekes, he called her. At that time she told him that he was not going to be hired after all because Sears had hired someone else in his place and the store did not have the payroll to hire yet another person. Subsequently, Santana learned that Virginia Born, a Caucasian woman, had been hired as a part-time loss prevention agent two weeks earlier, on November 12, 1996.

Upon hearing that he was not going to be hired, Santana immediately telephoned Sears corporate headquarters to complain about the way he had been treated. After Santana related his story, an employee in the corporate office asked if he was willing to take any available position at the Morehead City Sears; Santana stated that he was. Shortly thereafter, the corporate employee called him and said that the Morehead City store was going to find him a position before December 6 and someone would call him by November 29. When Santana did not hear from anyone, he called on December 2, 1996 and talked to Haynes, who said she did not know anything about finding him a position. The Morehead City Sears never employed Santana.[1]

In early 1997, Santana filed an EEOC claim against Sears alleging discrimination on the basis of national origin. Sears assigned David Cross, the Fair Employment Manager for the South Central region, to respond to the charge. Cross contacted Katsekes and Haynes in the course of preparing this response and asked why Santana had not been hired. Based on their explanations, Cross submitted a position statement for Sears to the EEOC. The position statement acknowledged Santana "had a number of years" experience in loss prevention at a Sears store in California, and that his job history was "a positive one." The Sears position statement asserted that the Morehead City store did not hire Santana before October 1996 because "he had not shown up or contacted the unit" and, although store employees repeatedly tried to contact him, they were "unable to do so." When Santana "finally showed up," he was told "that the position had been filled," and he responded that he "had been on deployment with the military." Thereafter, Santana "constantly inquired about any open positions in the unit." Recognizing that Santana "would be an asset" to the store, Sears interviewed him and requested "additional hours and payroll for its" loss prevention division, but the request was denied. Sears maintained that they did not hire Santana because there were no hours available in loss prevention.

---

[1]The above facts are those related by Santana. For purposes of summary judgment, they all must be accepted as true. However, in order to understand the legal issues involved in this case, we also set forth below Sears's version of the facts.

During discovery, Sears offered another story. Katsekes testified that it was difficult to find experienced loss prevention employees and that she was interested in hiring the "loss prevention agent from a California Sears store" that Mansfield told her about, but Mansfield was unable to locate this person in late 1995 or early 1996 at his work number, and was told by someone that he was on deployment. (Mansfield ended his employment with Sears in 1996 and did not testify or submit an affidavit.) Katsekes could not identify who told Sears this, and acknowledged that no effort was made to contact the California loss prevention agent at his home. She did not testify that this agent had been deployed by the Marines or had told the store he had been deployed. Moreover, Katsekes did not dispute that Santana had filed employment applications in January, March, and July 1996 but she maintained that she was "never aware of [the earlier] applications" and that the first time she saw his July application was in October 1996 when she interviewed him.

Katsekes admitted that the reasons she gave to Cross, and that he in turn gave to the EEOC in 1997, for refusing to hire Santana in October 1996 were inaccurate. She explained that she did have an available loss prevention position when she interviewed Santana because she had determined to "take those hours from somewhere else in the store" and "put on extra Loss Prevention help." Katsekes testified that she had been impressed with Santana's loss prevention experience and offered him a job, contingent on his passing a drug test and background check, "[h]owever . . . after the interview" she "was instructed not to go any further with the application." Katsekes acknowledged that a few weeks after she interviewed Santana, a Caucasian woman, Virginia Born, was hired as a part-time loss prevention associate. Sears records produced to Santana indicate that on November 12, 1996, Sears hired Born, who had no loss prevention experience, no previous employment history with Sears, and less education than Santana. Katsekes admitted that "[w]ith respect to education and prior experience," she would "have to say Mr. Santana" was more qualified than Born.

In her 1999 deposition, Katsekes testified that the reason Sears did not employ the better qualified Santana was not what she previously told Cross, but rather that, a few hours after her interview with Santana, Mrazick came into her office and told her that store manager

Patricia Kiely "decided that we're not going to go any further with this application." Katsekes maintained that she did not ask either Mrazick or Kiely the reason for this decision because she was angry at Kiely for overruling her without an explanation. Katsekes further testified that she did not inform Santana or Cross or the EEOC that Kiely had overruled her decision to hire Santana because she thought it reflected badly on the store.

Kiely testified in her deposition (taken in 1999, several months after Katsekes's) that in October 1996, when Mrazick told her that Katsekes "was getting ready to hire a guy from California with asset protection experience," she told him she "did not want that to happen," without explaining her reasons. Kiely maintained that in the beginning of 1996, she had a telephone conversation with Ann Manherz, a Sears regional manager, who mentioned in passing an unnamed "asset protection agent from California that had some sexual harassment issues," and Kiely mistakenly thought Santana "could be that person." (Sears does not contend and has not contended that Santana was in fact the individual to whom Manherz had referred.) Kiely acknowledged that she did not investigate or attempt to confirm that Santana was the suspected individual. Rather, she "assumed" that he was the individual Manherz had spoken about and therefore decided not to hire him. Kiely further asserted that, at the time she decided not to hire Santana, she had not met or seen Santana, and that she did not know his national origin or even his name.

Ann Manherz testified that she had no involvement with Santana's attempt to become employed at the Morehead City store, and that she had never discussed Santana with Kiely, Katsekes, Haynes, or anyone else except her lawyer. Manherz further testified that she never had any conversations with Kiely, Katsekes, or Haynes about employment decisions at the Morehead City store. In response to a question from Sears as to whether she "[c]ould . . . have had a conversation with Ms. Kiely about a loss prevention agent being accused of sexual harassment," Manherz responded, "I could have." In a later affidavit, Manherz elaborated that she was aware, in early 1996, that a loss prevention agent from a California store, who had been accused of sexual harassment, was looking for work in the Southeast and she could "very well" have talked with Kiely about this agent, but reiter-

ated that she did not know Santana or talk about him specifically with Kiely.

After discovery was completed, the district court granted Sears's motion for summary judgment. The court reasoned that, although the EEOC had established a prima facie case of national origin discrimination, it had failed to establish that Sears's proffered legitimate non-discriminatory reason for its failure to hire Santana — namely, Kiely's belief that he had "some sexual harassment concerns" — was a pretext for illegal discrimination.

## II.

A plaintiff establishes a prima facie case of discrimination in hiring when he demonstrates that (i) he belongs to a protected class, (ii) he applied and was qualified for a job for which the employer was seeking applicants, (iii) despite his qualifications, he was rejected, and (iv) after his rejection, the position remained open and the employer continued to seek applicants from persons of his qualifications. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).[2] Plainly, Santana satisfies all four elements of a prima facie case: (i) as a Hispanic Mexican-American, he is a member of a protected class, (ii) he applied and was well qualified for a position as a part-time loss prevention associate at Sears, (iii) despite his qualifications, Sears rejected him, and (iv) the position remained open, Sears continued to seek to fill it, and did shortly fill it by hiring a less qualified Caucasian woman.

Indeed, the prima facie case here is a strong one. The evidence as to Santana's year-long job seeking odyssey — including his numer-

---

[2]The Supreme Court has made it clear that because the facts of given cases "necessarily will vary" this formula "is not necessarily applicable . . . to differing factual situations." *McDonnell Douglas*, 411 U.S. at 802, n.13. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996). What is critical with respect to the fourth element is that the plaintiff demonstrate he was not hired (or fired or not promoted, etc.) "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dept. of Comty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

ous visits to the store, contacts with store personnel, and the filing of three different job applications — is uncontroverted. Unlike some cases, here the EEOC presented overwhelming evidence that Santana diligently applied for the job denied him. *Cf. Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998) (upholding dismissal of failure-to-promote claim where plaintiff did not allege that she had applied for a promotion); *Brown v. McLean*, 159 F.3d 898, 903 (4th Cir. 1998) (plaintiff who failed to apply for re-employment could not establish a prima facie case of discrimination); *Chambers v. Wynne Sch. Dist.*, 909 F.2d 1214, 1217 (8th Cir. 1990) (plaintiff did not establish a prima facie case of discrimination with regard to openings for which she never formally applied).

Furthermore the uncontroverted evidence clearly demonstrates that Santana, again unlike some discrimination claimants, was well qualified for the position he so eagerly sought. *Cf. Montgomery v. John Deere & Co.*, 169 F.3d 556, 559-60 (8th Cir. 1999) (plaintiff's prima facie case was, "at best, weak" where evidence showed that, at the time of his termination, his performance was deficient); *Pafford v. Herman*, 148 F.3d 658, 669 (7th Cir. 1998) (absent evidence that plaintiff was qualified for promotion, her prima facie case was "too weak to allow the factfinder to speculate" as to employer's motive) (internal quotation marks omitted). In fact, his previous ten years of experience as a part-time loss prevention agent with Sears would seem to make him as qualified as any person could be for this position.

It is also beyond question that Santana satisfied the third and fourth elements of the prima facie case, namely that, despite his qualifications, Sears rejected his application for employment and then quickly filled the position by hiring a Caucasian woman. While employers often insist in hiring cases such as this one that the person chosen for the job over the plaintiff was better qualified, *see, e.g.*, *Bray v. Marriott Hotels*, 110 F.3d 986, 990 (3d Cir. 1997), here even Sears concedes, as it must, that Santana's education and experience were superior to the Caucasian woman hired in his stead, who had never before worked for Sears, had less education, and had no loss prevention experience. In sum, Santana presented uncontroverted evidence of a strong prima facie case — despite his repeated applications, his superb qualifications, and his expressed willingness to accept any

available position, Sears refused to hire him at the Morehead City store and instead hired a Caucasian woman who, Sears itself concedes, was less qualified than Santana.

Once a plaintiff establishes a prima facie case, the burden then shifts to the employer to "produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). In this case, Sears has, over time, proffered several reasons for its failure to hire Santana, including the selection of someone else, a lack of available hours in the loss prevention department, and the belief that Santana had been investigated for sexual harassment in the past. Sears now insists that only this last explanation — the belief that Santana was the person described by Manherz who had been investigated for sexual harassment — is the true reason for its failure to hire Santana. If this is the reason Sears did not hire Santana — although this belief ultimately proved to be unfounded — it nonetheless constitutes a legitimate non-discriminatory explanation. *See Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 559-60 (7th Cir. 1987).

Once an employer offers a legitimate, non-discriminatory explanation for the challenged employment decision, "the plaintiff must than have an opportunity to prove . . . that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. The Supreme Court recently clarified the plaintiff's burden at the pretext stage in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S. Ct. 2097 (2000). The Court reiterated that evidence of pretext, combined with the plaintiff's prima face case, does not *compel* judgment for the plaintiff, because "[i]t is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." *Id.* at 2108 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993)). However, the *Reeves* Court made plain that, under the appropriate circumstances, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 2109.

Here, looking at the totality of the circumstances, there is ample evidence from which a factfinder could conclude that, in the words

of the *Reeves* Court, Sears's "asserted justification is false." *Id.* Indeed, the fact that Sears has offered different justifications at different times for its failure to hire Santana is, in and of itself, probative of pretext. *See, e.g.*, *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000) ("[W]hen a company, at different times, gives different and arguably inconsistent explanations, a jury may infer that the articulated reasons are pretextual."); *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext."); *EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994) (holding that a reasonable juror could infer that the shifting and inconsistent explanations given by the employer at trial were pretextual, developed over time to counter the evidence suggesting discrimination).

Moreover, a factfinder could infer from the late appearance of Sears's current justification that it is a post-hoc rationale, not a legitimate explanation for Sears's decision not to hire Santana. *See Tyler v. Re/Max Mountain States, Inc.*, 232 F.3d 808, 813 (10th Cir. 2000) ("We are disquieted . . . by an employer who 'fully' articulates its reasons for the first time months after the decision was made."). Katsekes interviewed and offered Santana a job in October 1996; the first time Katsekes claimed that Kiely overruled her decision to hire Santana was in her deposition in May 1999, over two and a half years later. Katsekes stated that she chose not to tell Santana at the time that her decision to hire him had been overruled by Kiely because she thought it reflected badly on the store. This explanation certainly seems possible. But, Katsekes had another opportunity to disclose Kiely's involvement in the decision not to hire Santana, namely in 1997, when Cross contacted her in the course of preparing his response to Santana's EEOC Charge of Discrimination, and she did not do so. Instead, Katsekes told Cross that no hours were available in loss prevention — an explanation that she conceded years later at her deposition was not accurate and is further belied by the fact that Virginia Born was hired as a loss prevention associate less than three weeks after Katsekes interviewed Santana.

Katsekes's failure to tell Cross or the EEOC of Kiely's involvement seems curious. If Kiely had instructed Katsekes not to hire Santana, why would Katsekes not tell this to Cross? She could hardly be

embarrassed to disclose this fact to Cross, a fellow Sears employee, and, as an operations manager, she must have known the importance of responding truthfully and completely to an EEOC discrimination charge. Furthermore, would she not have realized that Cross would want to talk to Kiely, if Kiely had indeed made the ultimate decision not to hire Santana? It seems probable that Katsekes would have mentioned Kiely's involvement during the EEOC investigation, if not before. Given that she did not do so, a trier of fact would certainly be entitled to infer that this explanation is nothing more than a post hoc rationale, invented for the purposes of litigation.

Apart from the late appearance of Sears's current explanation, there is additional evidence from which a factfinder could infer that it is unworthy of belief. Kiely claims that she ordered Katsekes not to hire Santana because, based on a casual conversation with Manherz eight months earlier, she believed that Santana had been investigated for sexual harassment. While Sears now acknowledges that this belief was incorrect, it contends that a mistaken belief, honestly held, is not a pretext for discrimination. In this case, however, the evidence does *not* support Sears's contention that Kiely honestly believed that Santana was the individual investigated for sexual harassment. Kiely admits that, at the time she rejected Santana, she did not know the name of the individual to whom Manherz referred and did not make any attempt to verify that Santana was, in fact, that individual. A juror could easily find it implausible that Kiely would reject a qualified applicant, such as Santana, without first substantiating that he was, in fact, the individual accused of sexual harassment. *See Smith v. Chrysler Corp.*, 155 F.3d 799, 807-08 (6th Cir. 1998) ("When the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any reliance placed by the employer in such a process cannot be said to be honestly held."). This is particularly true given that both Kiely and Katsekes testified that the Morehead City store had difficulty finding people experienced in loss prevention, as Santana was. The credibility of Kiely's explanation is further undermined by the fact that, until after this litigation was underway, she admittedly failed to reveal to anyone, including Mrazick or Katsekes, the now-asserted reason for her claimed directive not to hire Santana.

In sum, the EEOC made out a strong prima facie case of national origin discrimination and offered ample evidence to discredit Sears's proffered non-discriminatory reason for its failure to hire Santana. Under *Reeves*, this showing is sufficient to permit a trier of fact to "infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves*, 120 S. Ct. at 2108. Indeed, *Reeves* teaches that when "the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Id.* at 2108-09. Of course, if "no rational factfinder could conclude that the [employer's job] action was discriminatory," then the case should not proceed beyond summary judgment. *Id.* at 2109. But, in the absence of evidence requiring such a conclusion, a prima facie case and evidence of pretext raises a sufficient inference of discrimination to entitle a plaintiff to survive a motion for summary judgment.

Thus, the only remaining question is whether Sears has presented evidence such that "no rational factfinder" could conclude that Sears's refusal to hire Santana was motivated by national origin discrimination. *Id.* Sears maintains that it has. Specifically, Sears contends that it has presented evidence proving that: (1) the person who decided not to hire Santana was Kiely, and (2) Kiely did not know Santana's national origin. That argument must fail, however, because, although Sears has certainly presented evidence that could lead a factfinder to these conclusions, Sears has not presented evidence that requires this. Rather, ample evidence in the record would permit a reasonable trier of fact to reject either or both of these conclusions.

Sears maintains that Kiely, not Katsekes, decided to revoke the job offer to Santana. While that is certainly Sears's contention, there is a good deal of record evidence that discredits it. For example, Katsekes failed to tell anyone that Kiely was the decision-maker either at the time of Santana's job application or during the EEOC administrative process. The trier of fact could reasonably infer from Katsekes's failure to disclose Kiely's involvement until litigation had begun that the explanation is simply untrue, and that the relevant decision-maker in this case was Katsekes, not Kiely. Furthermore, Santana testified, in the kind of detail that imbues his testimony with credibility, that when Katsekes interviewed him, she did so in Kiely's untidy office,

explaining that Kiely was on vacation. If a factfinder credits this testimony, and Sears apparently offered no attendance records or other evidence to counter it, then Sears's contention that, within hours of Santana's interview, Kiely ordered Katsekes not to hire Santana appears unlikely.

Moreover, on the present record, it is undisputed that in the weeks following Santana's interview, Mrazick told Santana he would talk to "management" on Santana's behalf, Haynes told Santana his start date would begin after training and the background check were completed, and Katsekes continued to evade Santana's inquiries as to a start date. Indeed, Katsekes did not notify Santana for more than a month that she was withdrawing the job offer and during that time she hired a Caucasian woman for the job that had been offered to Santana. A factfinder could infer from this evidence that Katsekes, not Kiely, decided not to follow through on the job offer to Santana; that remembering Santana's accent and national origin, Katsekes became increasingly less enthusiastic about Santana as a candidate and for this reason, she delayed finalizing his start date; and that when Katsekes found a less "foreign" candidate, she determined to hire that person and revoke her offer to Santana. Of course, a finder of fact might not so conclude, but there is certainly evidence, now uncontroverted, that permits this inference.

Even if a factfinder should conclude that Kiely was the relevant decisionmaker, a factfinder might not accept Sears's second contention — that Kiely did not know Santana's national origin. As the EEOC notes, Kiely's assertion to this effect "is not supported by any other testimony in the record." EEOC Reply Brief at 6 n.2. In fact, Katsekes stated in her affidavit not that Mrazick told her to stop activity on the application of the unnamed California loss prevention agent, but that "Ms. Kiely had directed [Mrazick] to tell me that the store would not hire *Mr. Santana*," (emphasis added), suggesting that Kiely did know Santana by his "Hispanic sounding" name.

Moreover, Santana testified that he was in the Morehead City store very frequently over a year-long period, during which time he repeatedly talked with store personnel about job openings and submitted three job applications; even Sears conceded that Santana "constantly inquired" about open positions. Given this uncontroverted evidence,

a jury might conclude that Kiely, the manager of this small store, would over time have heard Santana's name or seen him and ascertained that this Hispanic man was the loss prevention agent from California. Furthermore, there is no dispute that numerous other members of the store's management — Katsekes, Haynes, Mansfield and Mrazick — who undoubtedly regularly discussed personnel matters with Kiely, did know of Santana's national origin. A jury might well infer that, in these discussions, they mentioned Santana's national origin to Kiely.

Because there is evidence from which a factfinder could conclude that Katsekes made the decision to revoke the job offer, or that Kiely did know Santana's national origin, a factfinder would be entitled to reject Sears's contentions that Kiely was the sole decision-maker and that she did not know of Santana's national origin. In other words, Sears has failed to demonstrate that "no rational factfinder could conclude that" Sears's refusal to hire Santana was motivated by illegal discrimination. *Reeves*, 120 S. Ct. at 2109.

Nor does the lack of direct evidence of anti-Hispanic animus or the fact that Sears has hired other Hispanics compel this conclusion. Since no direct evidence of animus is necessary to prove employment discrimination, *see United States Postal Bd. of Governors v. Aiken*, 460 U.S. 711, 716-17 (1983), its absence hardly compels a factfinder to conclude that the employer did not discriminate. Moreover, simply because Sears hired other Hispanic individuals in other departments does not mean that its failure to hire Santana was free from discriminatory intent. *See Connecticut v. Teal*, 457 U.S. 440, 453-55 (1982) ("Congress never intended to give an employer license to discriminate against some employees . . . merely because he favorably treats other members of the employees' group."); *Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000) (evidence that similarly situated non-black employees were treated in the same manner as plaintiff and that one other black employee was treated more favorably was insufficient to sustain summary judgment for employer because of Title VII's focus on protecting individuals, rather than a protected class as a whole). This is not to say that a trier of fact might not ultimately rely on this evidence in returning a verdict for Sears. But this evidence does not compel the grant of summary judgment to Sears because it does not foreclose the possibility that a factfinder could conclude that

national origin discrimination was the true reason for Sears's failure to hire Santana.

Sears's reliance on *Schnabel v. Abramson*, 232 F.3d 83 (2d Cir. 2000), is similarly misplaced. In that case, the Legal Aid Society hired Schnabel, a lawyer, as an investigator to replace a much younger man, Sherlock, who was attending law school. *Id.* at 85. Three years later, after Sherlock graduated, Schnabel's supervisor discharged him and rehired Sherlock; Schnabel then sued for age discrimination. *Id.* at 86. The Second Circuit upheld the grant of summary judgment to Legal Aid, finding that Schnabel had "put forth the minimal proof necessary to establish a prima facie case," that Legal Aid had proffered "clear and specific" non-discriminatory reasons for his termination, namely Schnabel's "asserted contempt for Legal Aid clients, difficulty following instruction, outright insubordination, and inept performance," and that Schnabel had little evidence that these reasons were pretextual. *See id.* at 87-88 (internal quotation marks omitted). Moreover, the court noted that Legal Aid offered a good deal of evidence that age was *not* the reason for Schnabel's termination — Schnabel was fired by the same man who had hired him three years earlier, when Schnabel already was 60 years old, and Schnabel was replaced by the person whom he originally had replaced after his employer "explicitly compared the performances of the two men, and found that Sherlock was a better investigator." *Id.* at 91.

*Schnabel* is distinguishable from the present case in virtually every important respect. First, while Schnabel proffered only a weak prima facie case, with his qualifications hotly disputed, Santana's prima facie case was strong — unquestionably his vast experience qualified him for the job he sought. Moreover, while in *Schnabel* the employer put forward several "clear and specific" nondiscriminatory reasons for the discharge and Schnabel offered only very thin evidence of pretext, *see id.* at 88, here, Sears's proffered reasons for its failure to hire Santana have constantly changed and there is abundant evidence of pretext. Finally, in *Schnabel*, the employer presented proof that illegal discrimination was *not* the reason for its employment decision, *see id.* at 91, here, by contrast, Sears has offered no such proof.

The case at hand is far more similar to a recent case from the Eleventh Circuit. In *Hinson v. Clinch County*, 231 F.3d 821 (11th Cir.

2000), a female high school principal, who the county demoted and replaced with a less-qualified male vice-principal, established a prima facie case of sex discrimination and produced evidence that the county's proffered reasons for her demotion were not credible; the district court, however, granted summary judgment to the county because Hinson had not offered any additional evidence that the real reason for the county's decision was discrimination on the basis of sex. *Id.* at 826, 831-32. The Eleventh Circuit reversed, finding that the district court erred in requiring the plaintiff "to show not only pretext but also additional evidence that the Board discriminated against her based on her sex." *Id.* at 831. While the record contained no additional evidence that indicated gender bias, the appellate court nonetheless concluded that the plaintiff had produced enough evidence to withstand the county's motion for summary judgment, explaining: "this is a case where a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 832 (internal quotation marks omitted). *See also Blow v. City of San Antonio*, 236 F.3d 293, 298 (5th Cir. 2001) (summary judgment for the employer inappropriate when plaintiff had proven a prima facie case, presented evidence creating a material issue of disputed fact as to whether the employer's explanation was false and no "unusual circumstances" prevented a rational fact-finder from concluding that the employer's reasons for failing to promote plaintiff were discriminatory).

The instant case is almost identical to *Hinson* in that there is a clear prima facie case of employment discrimination, a good deal of evidence of pretext casting serious doubt on the employer's proffered justification for its job action, and nothing to prevent a rational fact-finder from finding that the employer was motivated by discriminatory reasons. Moreover, while, as in *Hinson*, there is no additional evidence indicating that unlawful discrimination was the true reason for the employer's decision, there is also no evidence that precludes such a finding. *See Rowe v. The Marley Co.*, 233 F.3d 825, 830 (4th Cir. 2000). "[A]bsent such evidence [precluding a finding of discrimination], courts may not require a plaintiff who proves both a prima facie case and pretext to produce additional proof of discrimination in order to survive a defendant's motion for summary judgment." *Id.* In such circumstances, the factfinder is permitted "to infer the ulti-

mate fact of discrimination from the falsity of the employer's explanation." *Reeves*, 120 S. Ct. at 2108; *Hinson*, 231 F.3d at 832.

In sum, under the rule announced in *Reeves*, there is sufficient evidence in this case for a trier of fact to conclude that Santana was the victim of illegal discrimination. The EEOC, on behalf of Santana, has proven a strong prima facie case of national origin discrimination and has raised significant questions as to the validity of Sears's proffered non-discriminatory reason for its failure to hire Santana. Perhaps at trial, the EEOC will be unable to convince the factfinder that discrimination was the true reason for Sears's failure to hire Santana. But on this record, we cannot hold that "no rational factfinder could conclude" that intentional discrimination was the true motivation for Sears's decision. *Reeves*, 120 S. Ct. at 2109. Accordingly, the district court erred in granting summary judgment to Sears.

### III.

For the foregoing reasons, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*

NIEMEYER, Circuit Judge, dissenting:

It appears to me, regretfully, that the majority may have permitted the plaintiff's personal suspicions, coupled with Sears' clumsiness in giving its reasons for not hiring plaintiff, to become the *prima facie* case for national origin discrimination. The evidence to support national origin as a reason for not hiring the plaintiff is completely lacking. Indeed, because there is no more indication that the plaintiff was a victim of discrimination on the basis of national origin than there is that he was a victim of age discrimination or gender discrimination, the majority is incorrect in holding that a rational factfinder could conclude that Sears' decision not to hire Santana was based on *national origin* discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 120 S. Ct. 2097, 2109 (2000).

Human resources specialist, Patty Haynes, first interviewed Francisco Santana, the plaintiff, in October 1996 for a position at the

Morehead City (North Carolina) Sears store and, during the interview, noted Santana's accent, asking him where he was originally from. He said that he had been born in Mexico City. After the interview, Haynes offered Santana a job, albeit not the one he had originally applied for in late 1995. When he indicated that he was interested in a "loss prevention" position, as he had previously held at the Sears store in California, Haynes realized that Santana was "the guy from California" who had been an applicant since late in the previous year. Haynes took Santana to the store's operations manager, Teri Katsekes, and Katsekes offered Santana a part-time loss prevention position.

Later, however, Sears abandoned its offer to Santana on the instruction of Patricia Kiely, the store manager. When Kiely was told by an employee that Katsekes "was getting ready to hire a guy from California with asset protection experience," Kiely told the employee she "did not want that to happen," but she did not explain why. Kiely had never met the applicant, nor did she know his name or national origin. She simply overruled Katsekes, stating, "we're not going to go any further with this application." When Katsekes was advised of Kiely's decision, she became angry that she had been overruled.

As Kiely later explained, she had been told by a Sears regional manager several months earlier — during a period when Santana had been first prosecuting his application — about an unnamed "asset protection agent from California" who had "some sexual harassment issues." While Kiely recalls the conversation well and relied on it, the regional manager later confirmed a more limited recollection. The regional manager stated that early in 1996, a loss prevention agent from a California store, who had been accused of sexual harassment, was looking for work in the southeast and that she could "very well" have talked with Kiely about this agent. Kiely acknowledged that in October 1996 when Santana interviewed, she did not check whether Santana was this person; rather, she simply ended the interview process with Santana because she thought he might be the individual about whom she had heard earlier from the regional manager. Perhaps Kiely acted too cautiously or too abruptly. But there is nothing in the record to suggest that Kiely acted by reason of Santana's national origin. Indeed, when she interrupted the interview process, she did not know Santana's name or his national origin.

Not only is there a total lack of evidence in this case to support a motive based on national origin, there is also evidence that the Morehead Sears store did *not* discriminate by reason of national origin and was prepared to hire Hispanics. First, both Haynes and Katsekes had offered Santana a job. They had the authority to do so and obviously did not discriminate on the basis of Santana's national origin in doing so. Second, during this same period, Sears had hired other Hispanics in the store for various positions.

While it is true that various Sears employees were hesitant during discovery, indeed even inconsistent, in giving their reasons for not hiring Santana, at bottom it is apparent that the decision not to hire Santana occurred solely because of Kiely's intervention. And the only evidence about why Kiely made the decision to intervene was in response to information she had received about a California Sears employee, who was looking for a job in the southeast and who had "sexual harassment issues." While this information may not have been sufficient, without further investigation, to veto an employee's application, there is no evidence to suggest that Kiely was motivated by Santana's national origin. Accordingly, I do not believe that a question of fact has been created simply by Santana's personal belief that discrimination based on his national origin must have been the reason for his not receiving the Morehead City store job. *See Reeves*, 120 S. Ct. at 2108. Accordingly, I would affirm the summary judgment entered by the district court.