UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

---

No. 00-1093
(CA-98-84-5)

---

Gary L. Rowe,

                              Plaintiff - Appellant,

        versus

The Marley Company,

                              Defendant - Appellee.

---

O R D E R

---

        The  court  amends  its  opinion  filed  December  1,  2000,  as
follows:

        On page 3, 4th full paragraph, line 6 -- Barry Dunham's name
is corrected to read "age 49."

        On page 4, 5th full paragraph, line 1 -- the phrase "Garber
told Marley" is corrected to read "Garber told Rowe ...."

                              For the Court - By Direction


                              /s/ Patricia S. Connor
                                    Clerk

PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

GARY L. ROWE,
Plaintiff-Appellant,

v.

THE MARLEY COMPANY,
Defendant-Appellee,                           No. 00-1093

and

MARLEY PUMP COMPANY; UNITED
DOMINION INDUSTRIES, INCORPORATED,
Defendants.

Appeal from the United States District Court
for the Western District of Virginia, at Harrisonburg.
Jackson L. Kiser, Senior District Judge.
(CA-98-84-5)

Argued: November 1, 2000

Decided: December 1, 2000

Before MICHAEL, MOTZ, and KING, Circuit Judges.

_____

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Judge Michael and Judge King joined.

_____

COUNSEL

**ARGUED:** Thomas Edward Ullrich, WHARTON, ALDHIZER &
WEAVER, P.L.C., Harrisonburg, Virginia, for Appellant. Frank Ken-

neth Friedman, WOODS, ROGERS & HAZLEGROVE, P.L.C., Roanoke, Virginia, for Appellee. **ON BRIEF:** Thomas A. Leggette, WOODS, ROGERS & HAZLEGROVE, P.L.C., Roanoke, Virginia, for Appellee.

_____

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

Gary Rowe brought this action against his former employer, alleging that his termination violated ERISA, the Age Discrimination in Employment Act (ADEA), the Americans with Disabilities Act (ADA), and constituted wrongful discharge under Virginia law. After discovery was completed, the district court granted the employer summary judgment on the federal claims and, pursuant to a motion by Rowe, dismissed his state law claim without prejudice. We affirm.

I.

In 1984, The Marley Company hired Rowe to sell its line of residential water pump products. Rowe's territory as a regional sales manager for Marley was primarily limited to Virginia and West Virginia, but at times also included Delaware, Maryland, Kentucky, and western Pennsylvania. Throughout most of Rowe's employment at Marley, his supervisor was Paul Robinson, but in late 1996, Robert Garber, Marley's Vice President for Sales, assumed responsibility for supervising Rowe.

In 1993, Rowe, who was an insulin-dependent diabetic and in end stage renal failure, underwent a kidney and pancreas transplant. After returning to work in 1994, Rowe consistently performed all of the necessary functions of his job and received satisfactory performance ratings. Indeed, Rowe did not miss a single day of work in 1996 and 1997. Rowe maintains, however, that he still experiences health problems related to the transplant operation, such as fatigue, dizziness, short-term memory loss, and an inability to exert himself physically for more than an hour. He also claims to suffer from impotence and urinary frequency. As a result of the transplant, Rowe must take immunosuppressant medication and other drugs.

2

Through his employment with Marley, Rowe was eligible for group welfare benefits and he participated in the premium family health plan offered by Marley's parent company. Marley was self-insured and thus bore the cost of these benefits in its operating budget. Marley's health plan covered Rowe's immunosuppressant medications, resulting in a cost to Marley of over $1000 a month.*

After becoming Rowe's supervisor in late 1996, Garber, on occasion, commented on Rowe's health. Specifically, Garber told Rowe about a friend who had undergone the same transplant surgery as Rowe, but was still very ill. Garber expressed surprise that Rowe could still work full time after having undergone such a major operation. During the months immediately prior to Rowe's discharge, Garber continued to ask Rowe about his health and whether it impeded his ability to perform his job. Garber also knew that Rowe took immunosuppressant medication and assumed that Marley's health plan covered the cost of this medication.

In late 1996 or early 1997, Marley's president, James Gibbs, instructed Bob Moore, General Manager of Marley's Water Systems 7 Division, to reduce Marley's expense-to-revenue ratio. Marley was struggling financially as a result of the declining market for rural water pumps and other factors. As part of the effort to decrease Marley's expenses, Moore asked Garber to reconfigure the national sales territories so that each territory's annual sales would reach at least two million dollars.

To meet this new sales quota, Garber decided that it was necessary to reduce the number of East Coast sales territories from four to three. At that time, the East Coast salesmen were Bill Beyer, age 46, who covered New England and the Mid-Atlantic states; Rowe, age 48, who covered Virginia and West Virginia; Jeff Black, age 38, who covered the Carolinas and Georgia; and Barry Dunham, age 49, who covered Florida. Only Dunham's sales had exceeded two million dol-
_____

* Upon the recommendation of Rowe's supervisor, Marley agreed to pay for Rowe's medication beginning in 1995, although the plan did not cover such medication at that time. In 1997, the plan was amended and covered Rowe's transplant-related medication.

lars in the previous year. Garber decided to leave Dunham's territory alone and to divide one of the remaining three territories.

Ultimately, Garber decided to divide Rowe's centrally-located territory between Black and Beyer to create two territories, each of which would hopefully meet the two million dollar sales quota. Garber opted to retain Black and Beyer, and not to replace one of them with Rowe, for several reasons. First, Garber decided that Rowe's southern accent and demeanor would impede him from successfully selling in Beyer's more northern territory; second, he concluded that distributors in Pennsylvania might resent Rowe because he had previously provided sales assistance to one of their competitors; and third, Black had a particularly good relationship with Marley's largest customer, whose headquarters were located in Black's sales territory.

Rowe was not the only salesman affected by a territorial reconfiguration. Marley similarly divided a centrally-located sales territory in the Midwest and merged it into existing territories to the north and south. The reconfiguration of the Midwest territories resulted in the termination of another salesman, Del Walls, who was forty-one years of age.

At the same time it established the two million dollar sales quota, Marley instituted a company-wide reduction-in-force (RIF) as another means of cutting costs. Overall the RIF reduced Marley's payroll by nearly one-third, from 221 to 146 employees. As a result of the RIF, employees both over and under forty years of age lost their jobs. At present, Marley has only six regional salesmen, down from fourteen before the RIF.

During the period in which Marley began implementing its cost-cutting measures, Marley's parent company, United Dominion Industries ("UDI"), encouraged greater scrutiny of group welfare benefit expenses. To that end, UDI circulated to its subsidiaries an extensive report on 1996 group welfare benefit costs, rating each subsidiary, including Marley, on their costs versus the UDI median costs. While Marley's costs were below average for a UDI subsidiary, the report noted that Marley's 1996 costs were higher than its 1995 costs.

In April 1997, Garber told Rowe that his employment would be terminated because of the RIF and the territorial reconfiguration.

4

Rowe's discharge took effect in July 1997. In November 1998, after completing the EEOC administrative process, Rowe brought suit against Marley alleging that his termination violated ERISA, 29 U.S.C. § 1140 (1994), the ADA, 42 U.S.C. § 12101 (1994), the ADEA, 29 U.S.C. § 621 (1994), and constituted a wrongful discharge under state law. After discovery was completed, Marley moved for summary judgment on all counts. The district court granted the motion as to the federal claims and then granted Rowe's motion to dismiss the state wrongful discharge claim without prejudice.

II.

Rowe asserts that he has established a prima facie case of discrimination under ERISA, the ADEA, and the ADA, and we assume for the purposes of this appeal that he has. In order to survive summary judgment on these claims, however, Rowe must also demonstrate that Marley's proffered non-discriminatory reasons for his termination are pretextual.

While the elements of a prima facie case differ depending on the statute and the nature of the claim, proving a discrimination claim under any of these federal statutes requires a showing that an employer's asserted non-discriminatory reason for the challenged employment action is actually a pretext. See Reeves v. Sanderson Plumbing Prods., Inc., ___ U.S. ___, 120 S. Ct. 2097, 2106 (2000) (under the ADEA "the plaintiff may attempt to establish that he was the victim of intentional discrimination `by showing that the employer's proffered explanation is unworthy of credence'"); Baird v. Rose, 192 F.3d 462, 468-70 (4th Cir. 1999) (reversing dismissal of an ADA claim where the allegations in the complaint permitted a conclusion that the school's proffered non-discriminatory reason for excluding student from a school activity was a pretext for discrimination); Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 239 (4th Cir. 1991) ("Under the McDonnell Douglas scheme of proof, Conkwright's § 510 [ERISA] claim ultimately fails because he does not demonstrate a genuine issue on the matter of pretext.").

In arguing that he has established that Marley's asserted reasons for firing him are pretextual, Rowe heavily relies on the Supreme Court's recent decision in Reeves. In Reeves, the Supreme Court granted cer-

5

tiorari to resolve the conflict among the circuits "as to whether a plaintiff's prima facie case of discrimination, . . . combined with sufficient evidence for a reasonable factfinder to reject the employer's non-discriminatory explanation for its decision, is adequate to sustain a finding of liability for intentional discrimination." Reeves, 120 S. Ct. at 2104. (citing cases).

In the proceedings below, the Fifth Circuit had reversed a jury verdict in favor of the employee-plaintiff on the ground that, while the plaintiff had adduced sufficient evidence for a reasonable jury to conclude that the employer's explanation for the challenged employment decision was pretextual, "th[at] showing, standing alone, was insufficient to sustain the jury's finding of liability." Id. at 2108. The Fifth Circuit had required some additional evidence of discrimination, distinct from the evidence supporting plaintiff's prima facie case and the evidence used to challenge the employer's explanation for its decision, to sustain the jury's verdict. Id. The Supreme Court held that this was error. Id. The Court explained that "[i]n so reasoning, the Court of Appeals misconceived the evidentiary burden borne by plaintiffs who attempt to prove intentional discrimination through indirect evidence." Id.

The Reeves Court recognized that its decision in St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993), taught that "the fact-finder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not compel judgment for the plaintiff." Reeves, 120 S. Ct. at 2108 (emphasis added). The Court clarified, however, that it is "permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." Id. Thus, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Id. at 2109. In so holding, the Supreme Court invalidated the requirement that "a plaintiff must always introduce additional, independent evidence of discrimination" to survive summary judgment. Id.

Put another way, in Reeves the Supreme Court held that when a plaintiff establishes a prima facie employment discrimination case and that his employer's explanation is pretextual, this does not auto-

6

matically create a jury question, but it <u>may</u> do so. Even when a plaintiff demonstrates a prima facie case and pretext, his claim should not be submitted to a jury if there is evidence that precludes a finding of discrimination, that is if "no rational factfinder could conclude that the action was discriminatory." <u>Id.</u> But, absent such evidence, courts may not require a plaintiff who proves both a prima facie case and pretext to produce additional proof of discrimination in order to survive a defendant's motion for summary judgment. This is so because "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." <u>Id.</u> at 2108.

With these principles in mind, we turn to the facts of the case at hand.

III.

Marley asserts that it terminated Rowe for neutral, non-discriminatory reasons. Marley notes that, at the time of Rowe's termination, it had instituted a company-wide reduction-in-force, which, by necessity, meant that some employees would lose their jobs. Moreover, Marley points to the company directive that each sales territory produce at least two million dollars in sales, which required Garber to eliminate one of the East Coast sales territories. This meant that one of the salesmen in that region would lose his job. Marley proffered evidence that it opted to divide Rowe's territory because of its central location: it could be divided among existing sales territories without significant disruption. Garber recommended that Beyer and Black be retained, in lieu of Rowe, because (i) Garber believed that Rowe would not be successful selling to customers in the Northeast and (ii) Black had a particularly close relationship with Marley's largest distributor, whose headquarters were located in his territory.

Rowe has not forecast any evidence that casts doubt on the veracity of Marley's proffered explanation for his termination. To the contrary, the record supports Marley's contention that the company could not reconfigure the sales territories on the East Coast to conform with the two million dollar requirement without discharging a salesman. It also offers support for the purported rationale for the decision Marley made to discharge Rowe rather than another salesman -- the com-

7

pany had legitimate reasons for wanting to retain the salesmen in the northeast and southeast states, rather than move a new salesman to those states particularly one like Rowe who had lived in Virginia his whole life and was unfamiliar with those areas. The decision to discharge Rowe and retain Beyer and Black is the kind of business decision that we are reluctant to second-guess. See Henson v. Liggett Group, Inc., 61 F.3d 270, 277 (4th Cir. 1995) ("We have recognized the importance of giving an employer the latitude and autonomy to make business decisions, including workplace reorganization, as long as the employer does not violate the ADEA.").

Rowe attempts to demonstrate that Marley's proffered reasons for his termination are pretextual by arguing that Moore and Garber offered inconsistent explanations of the criteria used in determining which salesmen to discharge: while Moore stated that he believed Garber considered the sales staff's performance in deciding who to discharge, Garber stated that he did not consider that factor, and that his decision was based solely on "numbers, geography and relationships." Rowe's argument fails to prove pretext, however, because Garber was the only true decision-maker in this case; he was delegated the task of reconfiguring the territories and deciding which salespeople to discharge; Moore merely approved the selections. Because Garber was the relevant decision-maker, Moore's somewhat inconsistent statement as to the factors he believed Garber considered is simply not probative of pretext, particularly where, as here, there is no evidence to discredit Garber's explanation of how he decided which salesmen to discharge.

In sum, Reeves does not assist Rowe because he failed to demonstrate, with respect to any of his federal claims, that Marley's proffered non-discriminatory reasons for discharging him were pretextual. Because Rowe did not demonstrate that Marley's explanation for his discharge was pretextual, there is no evidence from which to infer that the real reason for his termination was illegal discrimination. Given this, the rule announced in Reeves, 120 S. Ct. at 2109 -- that a court cannot always require "additional, independent evidence of discrimination" -- does not affect the outcome of this case. Rather, it is Rowe's failure to demonstrate pretext on Marley's part that dooms his federal claims.

8

IV.

For the foregoing reasons, the judgment of the district court is

<u>AFFIRMED</u>.

9