UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

JACQUELINE WEBSTER; MYRA L.
PITTS; ELAINE M. SEESZ-PINDER,
          *Plaintiffs-Appellants,*

                    v.                                No. 00-1520

WILLIAM J. HENDERSON, Postmaster
General,
                    *Defendant-Appellee.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(CA-98-647-L)

Argued: December 5, 2000

Decided: February 25, 2002

Before WIDENER and KING, Circuit Judges, and
William L. GARWOOD, Senior Circuit Judge of the
United States Court of Appeals for the Fifth Circuit,
sitting by designation.

Affirmed by unpublished opinion. Judge Widener wrote the opinion,
in which Judge King and Senior Judge Garwood joined.

## COUNSEL

**ARGUED:** Shannon Micah Salb, Washington, D.C., for Appellants.
Tamera Lynn Fine, Assistant United States Attorney, Baltimore,

Maryland, for Appellee. **ON BRIEF:** Richard H. Semsker, Washington, D.C., for Appellants. Lynne A. Battaglia, United States Attorney, Baltimore, Maryland, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

WIDENER, Circuit Judge:

Plaintiffs Jacqueline Webster, Myra Pitts, and Elaine Seesz-Pinder (plaintiffs) appeal the district court's grant of summary judgment in their claims filed under the Rehabilitation Act, 29 U.S.C. § 791-976*l* (1999), and the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213 (1995 & 2000 Supp.). For the reasons that follow, we affirm.

### I.

Each plaintiff has been employed by the United States Postal Service (USPS) in Silver Spring, Maryland for several years. Each plaintiff is disabled because of on-the-job injuries.[1] The Silver Spring Post Office system consists of six different stations: Aspen Hill, Colesville, Silver Spring, Takoma Park, Wheaton, and Woodmoor. The Takoma Park Station is also referred to as the Blair Station.

In the fall of 1994, John Duchesne (Duchesne), the Silver Spring postmaster, established the Blair Support Center (the Blair Center). Duchesne stated that the operational purpose of the Blair Center was to sort through bulk mail looking for first class mail accidentally

---

[1]In 1995, Webster suffered a back injury while working at the Wheaton facility. In February 1992, Seesz-Pinder suffered a back injury while working at the Wheaton facility. In May 1990, Pitts suffered an injury while working at the Aspen Hill facility.

placed there. In response to complaints from customers regarding the untimeliness of mail, some of it was lying on the platform or some place else not secure, Duchesne believed that a specialized unit would improve the timeliness of processing return-to-sender and undeliverable bulk mail, relieve overcrowding caused by lack of space for storing unprocessed mail, and protect the security of the mail in close quarters, where other mail was inadvertently mixed in with return-to-sender mail. Duchesne's problem was delay, intermixing, and space. He tried every trick he knew, including working Sundays. Several options were discussed to address this problem, and the creation of a centralized system was recommended by Duchesne. Duchesne, after consultation with the union, ultimately made the decision to institute the Blair Center with the knowledge of higher USPS management. A similar program was used in Washington, D.C. for the sorting of return-to-sender mail. Duchesne chose the Takoma or Blair Station[2] to house this operation because it had a large work floor that had been used for a similar centralization project—the processing of Express Mail.

The Blair Center did not provide optimal working conditions. Plaintiffs and other employees worked in an old warehouse portion of Blair Station with inadequate heating, several broken windows, and uneven hardwood floors. Moreover, Blair Center workers had access to parking spaces until only approximately 6:30 a.m.; after that time, workers had to leave work and seek out street parking. Duchesne chose to operate the Blair Center on a modified night shift, from 2:00 a.m. until 10:30 a.m. Duchesne chose these hours because those were the hours when the mail could be put on trucks or existing runs without making special runs to or from the other area post offices. These hours also were anticipated to permit mail sorted out at the Blair Center to be returned to local stations as necessary without using special runs.

---

[2]The operation at issue in this case, the Blair Support Center, was located in a large warehouse-style portion of this larger Station. The entire Blair Station was used as a regular post office and housed several administrative offices, including that of the postmaster. In addition to the facility which is the subject of this claim, the Postmaster himself worked in the building, as did the staff, the accounting department, and carriers.

After deciding to create the Blair Center, Duchesne turned to the question of staffing it with then-existing personnel because additional staff would not be provided. To staff the Blair Center, Duchesne selected limited and light duty personnel, desiring to provide sufficient work for this class of workers. Limited and light duty personnel are those whose work is limited by medical or other conditions.[3] Duchesne chose this class of workers because they would have the least impact on mail operations. In this regard, they were less flexible than other workers and could not be moved from work station to work station with ease because they could mistakenly be put in a position requiring work beyond their medical limits. Moreover, Duchesne thought this class of workers was best suited for the Blair Center because the Blair Center could be set up to accommodate their medical needs and get the work done.

All limited duty workers were then transferred from their home stations to the Blair Center.[4] Upon reassignment, all employees were assigned to clerk positions. In some cases, reassignments resulted in a loss of seniority.[5] The USPS personnel rules and agreements with the American Postal Workers Union (Union) provided that USPS could alter workers' stations, hours, and crafts to provide them with adequate work within their medical limitations. Duchesne consulted with the Union during the creation of the Blair Center and the finding of the district court that the Union contract was complied with is not contested on appeal. Workers were compensated with bargained-for night differential pay.[6] There were approximately 43 limited duty

[3]Employees who are injured on-the-job are put in limited duty positions in accordance with the Federal Employees Compensation Act, 5 U.S.C. Chapter 81. Employees who are injured while employed by USPS but whose injuries are not caused by their work may request light duty positions under the collective bargaining agreement between the USPS and the American Postal Workers Union.

[4]Plaintiff Webster was transferred in October 1994. Plaintiff Pitts was transferred on or about November 8, 1994. Plaintiff Seesz-Pinder was transferred on September 18, 1995.

[5]This loss of seniority was permissible under the Snow Arbitration Award the Union previously obtained on February 7, 1994.

[6]In this regard, the Union contract states, "For time worked between the hours of 6:00 p.m. and 6:00 a.m. employees shall be paid additional compensation at the rate of ten percent (10%) of the base hourly straight-time rate."

employees before the Blair Center was created; after its creation, there were 23.

Plaintiffs state that the true reason the Blair Center was created was because USPS management believed that limited duty employees reduce productivity, affect morale, and often are plagued by malingerers. Although these rumors may have existed in the Silver Spring postal system, each plaintiff has stated that no supervisor ever articulated this as the reason for creating the Blair Center. (Webster A. 38-39, Seesz A. 34-35, Pitts A. 21-22). Upon questioning, Patrick Donahue, District Manager of the Capital District and Mr. Duchesne's second line supervisor, stated that the Blair Center was created to control return-to-sender mail in an efficient manner. Roland Dustin, the Postmaster's designee in the area of limited duty assignments, stated that the purpose of the Blair Center was to accommodate limited duty employees and to serve postal customers more efficiently. Likewise, Willie Miner, Manager of the Post Office Operations for the Capital District, stated that the Blair Center was established to accommodate injured employees. Leslie Bell, the Customer Service Supervisor, also stated that the Blair Center was created for accommodating limited duty employees. No manager stated that the reason for creating the Blair Center was to decrease the number of limited duty employees. Duchesne retired from USPS on June 27, 1996. Bensing was subsequently placed in charge of the Blair Center. In December 1996, Bensing decided to halt operation of the Blair Center because he believed efficiency would be improved if the staff returned to their home stations.[7] In a memorandum to the USPS Branch Managers, Bensing wrote, "If it appears that the number of ill or injured employees increases because of more favorable work hour/location, then we will re-initiate the Blair Station as concentration point for all service center work."

---

[7]The Blair Center centralized the work of all limited duty employees from the seven stations making up the Silver Spring postal system into one station—the Blair Station. Under this scheme, an employee would be moved from their original or home station upon being considered a limited duty employee. Bensing believed that workers were ultimately more efficient in their home station because "[s]ome of them have specific job knowledge of the work that goes on in these units, specifically, the scheme knowledge as an example. Or as a letter carrier they would have knowledge of several letter routes . . . ."

Plaintiffs filed charges with the Equal Employment Opportunity Commission (EEOC). The EEOC denied relief. The plaintiffs subsequently filed a complaint in district court alleging violations of the Rehabilitation Act and the ADA. Plaintiffs' amended complaint states four causes of action: 1) Count I alleges disability discrimination in violation of the Rehabilitation Act; 2) Count II alleges retaliation in violation of the Rehabilitation Act; 3) Count III alleges disability discrimination in violation of the ADA; 4) Count IV alleges retaliation in violation of the ADA. After discovery, USPS filed a Motion for Summary Judgment under Rule 56 of the Federal Rules of Civil Procedure. The District court granted the motion because although it assumed, without finding, that plaintiffs had established a prima facie case, "an adverse employment action," USPS offered legitimate, non-discriminatory reasons for establishing the Blair Center. The court held that the plaintiffs failed to establish pretext and granted summary judgment to the defendant. This appeal followed.

II.

We review a district court's grant of summary judgment de novo. See *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995). The moving party must demonstrate the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). We consider the facts in the light most favorable to the nonmoving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A plaintiff's naked opinion, without more, will not shield a plaintiff from a grant of summary judgment. See *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988).

Congress enacted the Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C. §§ 701-796*l*, and the Americans with Disabilities Act of 1991 (ADA), 42 U.S.C. §§ 12101-12113 (incorporating amendment of the Civil Rights Act of 1991, Pub. L. No. 102-166, 1991 U.S.C.C.A.N. (105 Stat.) 1071), to protect disabled individuals from discrimination and to require that covered employers provide reasonable accommodation to disabled persons. When a plaintiff presents a claim for employment discrimination with no direct evidence of discriminatory conduct, the case is "subject to the burden-shifting scheme of *McDonnell Douglas*." See *Hawkins v. PepsiCo, Inc.*, 203

F.3d 274, 278 (4th Cir. 2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)); *Ennis v. Nat'l Assoc. of Business & Educ. Radio*, 53 F.3d 55, 58 (4th Cir. 1995) (holding that *McDonnell Douglas* scheme applies to claims of discrimination based on handicap status under Rehabilitation Act as well as ADA). *McDonnell Douglas* requires a plaintiff to make a prima facie case of employment discrimination, which then shifts the burden of production to the employer to proffer some legitimate, nondiscriminatory reason for its action. See *Hawkins*, 203 F.3d at 278. To establish a prima facie case of discrimination, a plaintiff must prove that: (1) he is a member of a protected group; (2) he was subject to an adverse employment action; and (3) this adverse employment action occurred under circumstances that raise a reasonable inference of unlawful discrimination. See *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 201 (4th Cir. 1997).

If the plaintiff establishes a prima facie case and the defendant then articulates a legitimate, nondiscriminatory explanation for its action, the presumption created by the prima facie case "drops from the case," and the plaintiff bears the ultimate burden to prove that the defendant's proffered reason is pretextual and that the defendant intentionally discriminated against the plaintiff. See *Halperin*, 128 F.3d at 201 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). Mere speculation by the plaintiff that the defendant had a discriminatory motive is not enough to withstand a motion for summary judgment. See *Autry v. North Carolina Dep't of Human Resources*, 820 F.2d 1384, 1386 (4th Cir. 1987); *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241-46 (4th Cir. 1982).

At the outset, we easily dispose of Counts III and IV of plaintiffs' complaint under the ADA because USPS is not an "employer" under the express terms of the Act. See 42 U.S.C. § 12111(2), (5)(B)(i).

We next address Counts I and II of plaintiffs' complaint under the Rehabilitation Act, 29 U.S.C. § 794. The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity . . . conducted by any Executive agency or the United States Postal Service."

29 U.S.C. § 794(a). In general, the Act requires employers to make a "'reasonable good-faith effort to adjust its legitimate needs to a handicapping condition' that requires a reasonable accommodation in order for the employee to perform the essential functions of the position." *Gaines v. Runyon*, 107 F.3d 1171, 1178 (6th Cir. 1997). The Act, however, does not mandate preferential treatment of an employee by virtue of his handicap and does not impose a duty to provide every accommodation requested. See *Gaines*, 107 F.3d at 1178.

Plaintiffs' initial claim is unusual, even extraordinary, because they contend that the method of accommodation chosen by USPS was, in itself, an act of discrimination. Plaintiffs argue that all disabled employees were segregated from the general postal worker population with the intent to dissuade this class of workers from taking advantage of limited and light duty status. USPS argues that it had legitimate, nondiscriminatory reasons for the creation of the Blair Center and its staffing with limited and light duty personnel. Moreover, it argues that plaintiffs have not met their burden of proving that discrimination was the real reason for the creation of the Blair Center.

We first address plaintiffs' contention that a triable issue regarding the motivation for creating the Blair Center exists. We assume, *without deciding*, as the district court did not decide, that placing the plaintiffs at the Blair Center constituted an adverse employment action and that the prima facie case has been established.[8] USPS, however, has established several legitimate, nondiscriminatory rea-

---

[8]USPS does not dispute that the plaintiffs were handicapped for purposes of the Act because they were certified as limited duty employees through the internal USPS process. Additionally, this court has held that reassignments can form the basis of a Title VII claim. In *Boone v. Goldin*, this court stated that "reassignment can only form the basis of a valid Title VII claim if the employee can show that the reassignment had some significant detrimental effect on her . . . . [However,] a change in working conditions may be a factor to consider in assessing whether a reassignment qualifies as an adverse employment action that could give rise to Title VII liability." 178 F.3d 253, 256 (4th Cir. 1999). In this case, it is argued that a shift in working hours, some loss of parking, the conditions of the heat, broken windows, and uneven floors would suffice under the statute.

sons for the establishment and staffing of the Blair Center. At the out-set, Duchesne named several functions that were not addressed adequately by the pre-Blair Center organization including that return-to-sender and undeliverable bulk mail was not being timely processed, inadequate security of mail because some was inadvertently mixed with return-to-sender mail, and a lack of storage space for unprocessed mail. Indeed, at another postal center (Washington, D.C.) with a similar return mail problem, such a unit as Duchesne ordered had been established and staffed with disabled employees. Regarding the choice of the Blair Center, the record reflects that this area had ample work space and had in the past been used for another unit that dealt with express mail. Moreover, the modified work shift also had logistical significance because during these hours no additional transportation-added expense accrued.

The plaintiffs' main complaint, however, was Duchesne's choice to staff the Blair Center with limited and light duty personnel. Duchesne chose these employees because they, as a group, were not used optimally in other offices. Moreover, centralization allowed management to provide sufficient work within the restrictions imposed by their medical conditions. Significantly, the accommodations provided were within the bounds permitted by the personnel rules and were discussed with the union prior to implementation.

To withstand USPS's motion for summary judgment, plaintiffs must prove that these legitimate nondiscriminatory reasons were merely pretext for unlawful discrimination, which was the real reason for the changes. Plaintiffs allege that the real reason USPS established Blair Center and staffed it with limited duty employees was to force limited and light duty employees to resume regular work. Plaintiffs highlight the different opinions stated by USPS management regarding the impetus for setting up the Blair Center and a memorandum from Bensing, Duchesne's successor, to support their contention. We recently rejected a similar claim in a case so nearly on the same facts as to be indistinguishable, *Rowe v. Marley Co.*, 233 F.3d 825, 831 (4th Cir. 2000). In *Rowe*, the plaintiffs attempted to prove pretext by arguing that different supervisors "offered inconsistent explanations of the criteria used in determining which salesman to discharge." *Rowe*, 233 F.3d at 831. We held that the argument failed to prove pretext because there was "only [one] true decision-maker in this case"

and the other supervisor "merely approved the selections." *Rowe*, 233 F.3d at 831. The "somewhat inconsistent statements as to the factors [the other supervisor] believed [the decision-maker] considered is simply not probative of pretext." *Rowe*, 233 F.3d at 831.

Similarly, in this case, the different recollections by the several supervisors do not establish pretext because Duchesne was the relevant decision-maker responsible for the creation and staffing of the Blair Center. Duchesne stated that he was responsible for the decision and that he made the decision with the knowledge of higher management.[9] Additionally, whether the reason was to provide adequate work to limited duty personnel or to deal with third class mail does not have significance, both were legitimate concerns for management. Moreover, although a sentence of Bensing's memorandum, if vastly stretched, might support plaintiffs' theory of illegal motivation, it does not show that the initial creation of the Blair Center was motivated by this goal, but merely tends to show that a subsequent postmaster may have entertained this notion.[10] Thus, Bensing's memo is not probative of Duchesne's motivation in creating the Blair Center. It is not the purpose of this court to second guess the wisdom of business decisions, even if they ultimately prove inefficient as plaintiffs have suggested in this case. See *EEOC v. Clay Printing Co.*, 955 F.2d 936, 946 (4th Cir. 1992).

In sum, the evidence presented is not sufficient to create a triable issue that the legitimate, nondiscriminatory reasons urged by Duchesne and USPS for the creation of the Blair Center were merely pretext for discrimination. Accordingly, the decision of the district court granting summary judgment on plaintiffs' discrimination claim under the Rehabilitation Act is affirmed.

---

[9]In response to an Interrogatory, USPS stated that the decision to create Blair Center was made by Duchesne, and his supervisors, Pat Donohoe, the former District Manager for the Capital District, and Willie Miner, the Manager of Post Office Operations for the Capital District. Duchesne has never disputed that higher management was aware of the decision, and acknowledges he was responsible for making it.

[10]That sentence is: "If it appears that the number of ill or injured employees increases because of more favorable work hour/location, then we will reinstate the Blair Station as concentration point for all service center work."

### III.

We next address plaintiffs' argument that USPS did not provide reasonable accommodation under the Rehabilitation Act. As noted above, the Rehabilitation Act does not require that the employer make every requested accommodation, but only that the accommodations provided in fact are reasonable.

In this case, plaintiffs do not claim that they were not provided with work within their medical restrictions prior to the Blair Center's creation or at the Blair Center. In fact, casual employees worked specifically at Blair Center to assist the limited duty employees with lifting. The main complaint is that the hours, working space and conditions, and lack of parking spaces made the job of sorting third class mail an unacceptable accommodation for this class of workers. The record reflects that other employees worked night shifts and that parking was not guaranteed for any postal employee. Plaintiffs cannot seek another form of accommodation when the type of accommodation chosen by the employer is reasonable, which was patently the case here.

### IV.

Finally, we address plaintiffs' claim of retaliation under the Rehabilitation Act. To prevail on a claim for retaliation, plaintiffs must prove that they were engaged in a protected activity under the Rehabilitation Act, that the defendant took an adverse employment action against them, and that there is a causal connection between the protected activity and this adverse action. See *Sherman v. Runyon*, 235 F.3d 406, 410 (8th Cir. 2000); *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994). To be engaged in a protected activity under the Rehabilitation Act, plaintiffs must have been protesting what they perceived as discriminatory acts by USPS.

Plaintiffs assert that their original requests for accommodation are an exercise of statutory rights sufficient to trigger protection against retaliation. Assuming this may be true, plaintiffs have not shown how they were retaliated against. Significantly, no plaintiff was denied the status of a limited duty employee and as indicated above, plaintiffs have not borne their burden of proving that the legitimate, nondis-

criminatory reasons proffered by USPS were merely pretext for discrimination or, in this case, retaliation. Thus, their claims for retaliation fail.

V.

Because the plaintiffs have failed to prove that Duchesne's legitimate, nondiscriminatory reasons in creating the Blair Center were merely pretext for illegal discrimination, we affirm the district court on that point. Similarly, because the plaintiffs have failed to make out a case for failure to accommodate or for retaliation, the district court is also affirmed on that account.

The judgment of the district court is accordingly

*AFFIRMED*.