**Woodrow W. HARDY, Plaintiff,**

v.

**RF MICRO DEVICES, INC., Defendant.**

**No. 1:00CV1251.**

United States District Court, M.D. North Carolina.

April 3, 2002.

Thomas M. Van Camp, Van Camp Meacham & Newman, PLLC, Pinehurst, NC, for Plaintiff.

Richard Lee Rainey, Womble Carlyle Sandridge & Rice, PLLC, Charlotte, NC, for Defendant.

### MEMORANDUM OPINION

BEATY, District Judge.

## I. INTRODUCTION

This matter is currently before the Court on Defendant RF Micro Devices, Inc.'s ("Defendant") Motion for Summary Judgment [Document # 16] as to Plaintiff Woodrow W. Hardy's ("Plaintiff") claim of employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 12 U.S.C. § 2000e *et seq.* ("Title VII"). Also before the Court is Defendant's Motion to Strike [Document # 21], which seeks to strike a portion of Plaintiff's affidavit. For the reasons explained below, both Defendant's Motion for Summary Judgment and Defendant's Motion to Strike are DENIED.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The documents available to the Court indicate that Plaintiff was hired by Defendant on November 2, 1998 as the third shift supervisor at Defendant's Greensboro, North Carolina facility.[1] Plaintiff was hired by Mr. Bob Myers; Mr. Myers also served as Plaintiff's supervisor. As third shift supervisor, Plaintiff was responsible for managing the employees who worked the third shift, which ran from 10:00 p.m. to 6:30 a.m. Because there was typically no other management personnel available during the third shift, Defendant claims that it was important for the third shift supervisor to maintain control over his subordinates.

For approximately the first six months of his employment, it appears that Plaintiff supervised the third shift without incident. In May, 1999, though, Plaintiff's supervisor, Mr. Myers, received an informal report from Ms. Cathy Misenheimer that there was inappropriate behavior occurring during the third shift. Ms. Misenheimer characterized this inappropriate behavior as "horseplay" and "excessive breaks." Defendant claims that Ms. Misenheimer's report caused it some concern because, as stated, Plaintiff was typically the only management personnel available during the third shift. Nevertheless, Defendant did not address the matter with Plaintiff at that time.

In June, 1999, two third shift employees, Ms. Rona Batton and Mr. David Cichowski, met with Mr. Myers about alleged problems with the third shift. According to Plaintiff, these alleged problems did not involve any improper conduct on the part of Plaintiff. Nevertheless, Plaintiff claims that Ms. Batton and Mr. Cichowski circumvented Plaintiff, their direct supervisor, and spoke directly with Mr. Myers. In any event, Ms. Batton and Mr. Cichowski allegedly reported that "employees on [the] third shift were not staying with their work stations, were taking excessive breaks, and were clowning around." (Pl.'s Br. Opp'n Def.'s Mot. Summ. J., at 3.) According to Ms. Batton and Mr. Cichowski, the problems they reported were the direct result of Plaintiff's alleged inability to manage and control the employees working on the third shift. In response to the complaints reported by Ms. Batton and Mr. Cichowski, Mr. Myers met with Plaintiff on June 16, 1999. They discussed the reported problems with the third shift, although Plaintiff denied any knowledge

---

1. Defendant manufactures microchips for use in cell phones and electronic toys. Plaintiff supervised the third shift test group, a quality control division which tests the microchips before they are shipped to customers.

that third shift employees were taking excessive breaks or acting inappropriately. According to Defendant, as a result of this meeting, Plaintiff was counseled regarding his failure to control the third shift. Moreover, Defendant claims that it delayed a general pay raise that Plaintiff was due to receive.

Plaintiff was apparently concerned about the perception that he could not effectively supervise his shift, because after the June 16, 1999 meeting with Mr. Myers, Plaintiff called a meeting with the entire third shift. Mr. Myers attended this meeting as well. According to Plaintiff, at that meeting, he discussed the fact that certain employees had reported that there were problems with the third shift. Plaintiff specifically identified the problems of taking excessive breaks and acting inappropriately. Plaintiff further alerted his shift that, in the event they were involved in any such activity, it was unacceptable and would no longer be tolerated. Defendant concedes that after this meeting, conditions during the third shift improved. In fact, Mr. Myers received reports from both Ms. Batton and Mr. Cichowski suggesting that things had indeed improved on the third shift. Notably, on August 10, 1999, Plaintiff received the performance pay raise that was previously delayed after his June 16, 1999 meeting with Mr. Myers.

For approximately the next three months, there were apparently no reports of problems involving the third shift. In mid-September, 1999, however, Mr. Chris Calabro, a manager in Defendant's quality department was working late on a project. He needed to use a machine on the test floor, the area where Plaintiff worked. Mr. Calabro entered the test floor at approximately 2:00 a.m. and reportedly saw that many of the test machines were broken down. According to Mr. Calabro, it appeared that roughly half of the machines were not operating. Also, Mr. Calabro indicated that very few third shift employees were operating machines on the test floor and that Plaintiff was not at his desk. After Mr. Calabro reported his observations, Mr. Myers spoke directly with Plaintiff regarding his ability to control the employees on the third shift. Plaintiff denied that half of the machines were down and that many of the third shift workers were not at their work stations. Defendant claims, however, that Mr. Calabro's observations were corroborated by several third shift employees, some of which were African-American, with whom Mr. Myers had recently spoken regarding Plaintiff's ability to control the shift.[2]

According to Defendant, Mr. Myers made the decision to demote Plaintiff to the position of first shift senior test operator because Mr. Calabro's report suggested that Plaintiff had failed to gain control over the employees on the third shift. When Mr. Myers reviewed the matter with his superiors, they allegedly favored terminating Plaintiff's employment altogether. Mr. Myers, however, ultimately chose the less severe action of demoting Plaintiff because he felt that Plaintiff was a good worker but simply lacked the supervisory skills necessary for a management position. (Myers Dep., at 70.) Plaintiff was notified of his reassignment by a "Performance Warning/Position Reassignment" letter dated September 28, 1999.

After his demotion, Plaintiff filed a formal grievance with Defendant's human resource department claiming that his demotion was unfair. Plaintiff's grievance was investigated by Mr. Doug Bonner, the human resource manager. According to Mr.

---

**2.** Mr. Myers did admit, in his deposition, that no investigation was conducted to determine the legitimacy of Mr. Calabro's claims. (Myers Dep., at 71.)

Bonner, he and Plaintiff agreed that a random selection of third shift employees would be interviewed to determine whether there was a sufficient basis for the demotion. Thereafter, Mr. Bonner spoke to two employees, one of which was African–American; according to Mr. Bonner, the two employees confirmed that there were some problems regarding control of certain employees on the third shift. Based on this information, Mr. Bonner decided that the decision to reassign Plaintiff to a lower position would stand.

Plaintiff filed suit in the instant matter on December 18, 2000, alleging that he was demoted on the basis of race in violation of Title VII. Discovery in this case ended on December 14, 2001. On January 2, 2002, Defendant filed the current Motion for Summary Judgment [Document # 16]. Defendant also filed, on January 25, 2002, a Motion to Strike [Document # 21] seeking to strike certain portions of Plaintiff's affidavit. The Court will now consider the merits of each of Defendant's motions, beginning with Defendant's Motion for Summary Judgment.[3]

## III. DISCUSSION

### A. Defendant's Motion for Summary Judgment

#### 1. Summary Judgment Standard

Summary Judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, the Court is not " 'required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party.' " *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (quoting *Schuylkill & Dauphin Imp Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867, 872 (1871)). In considering a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party, in this case, Plaintiff, and accord that party the benefit of all reasonable inferences. *Bailey v. Blue Cross & Blue Shield*, 67 F.3d 53, 56 (4th Cir.1995), *cert. denied*, 516 U.S. 1159, 116 S.Ct. 1043, 134 L.Ed.2d 190 (1996). Moreover, the Court should not grant a motion for summary judgment " 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.' " *Campbell v. Hewitt, Coleman & Assocs.*, 21 F.3d 52, 55 (4th Cir.1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.*, 381 F.2d 245, 249 (4th Cir. 1967)). Nevertheless, a mere scintilla of evidence is insufficient to withstand a motion for summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202. There must be evidence "on which the jury could reasonably find for the plaintiff." *Id.* With this standard in mind, the Court must evaluate the merits of Plaintiff's Title VII claim to determine whether summary judgment in favor of Defendant is proper.

#### 2. Plaintiff's Title VII Claim

■ Plaintiff's sole cause of action alleges that his demotion was motivated by race

---

**3.** The Court considers Defendant's Motion for Summary Judgment first even though Defendant's Motion to Strike relates to documents submitted by Plaintiff in opposition to the Motion for Summary Judgment. The Court proceeds in this manner because, as explained below, summary judgment is not warranted irrespective of the documents subject to the Motion to Strike.

in violation of Title VII. Specifically, Title VII makes it unlawful to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ...." 42 U.S.C. § 2000e–2(a)(1). With respect to a claim for race discrimination under Title VII, there are two methods by which a plaintiff can prove his case. *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 606–07 (4th Cir.1999). First, a plaintiff can utilize ordinary principles of proof using any direct or indirect evidence that is probative of discrimination. *Id.* at 607. Or, a plaintiff can rely on the burden-shifting scheme first recognized in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Brinkley*, 180 F.3d at 607. In the instant case, because Plaintiff has offered no direct or indirect evidence of discrimination, his claim for race discrimination is subject to the *McDonnell Douglas* framework.[4]

Under the *McDonnell Douglas* scheme, in order for an employee to establish a claim that he was demoted on the basis of race, he must first make out a prima facie case of discrimination. *Gillins v. Berkeley Elec. Coop., Inc.*, 148 F.3d 413, 415 (4th Cir.1998). A prima facie case is established by demonstrating four elements:

1) that the plaintiff is a member of a protected class;

2) that the plaintiff suffered an adverse employment action;

3) that at the time of the adverse employment action, the plaintiff was meeting his employer's legitimate work expectations; and

4) the position remained open or was filled by a person outside of the protected class.

*Brinkley*, 180 F.3d at 607. Once the employee satisfies the requirements to establish a prima facie case, the employer faces a burden of production requiring it to articulate a legitimate nondiscriminatory reason for the employee's demotion. *Gillins*, 148 F.3d at 415. If the employer meets this burden of production, the presumption of unlawful discrimination created by the prima facie case vanishes, requiring the plaintiff to prove that the employer's proffered reason is a pretext for discrimination in order to recover. *Id.* at 415–16. In light of *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), no longer is a plaintiff required to show pretext *plus* some additional evidence of discrimination. *Id.* at 148, 120 S.Ct. at 2109. In other words, the Court may infer the ultimate fact of discrimination merely from the falsity of the employer's proffered explanation. *Rowe v. Marley Co.*, 233 F.3d 825, 830 (4th Cir.2000). Nevertheless, the plaintiff, at all times, bears the ultimate burden of persuasion with respect to the employer's alleged unlawful discrimination. *Texas Dep't Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

In considering Plaintiff's prima facie case, the Court notes that Plaintiff has certainly met three of the four requisite elements of his prima facie case. As an African–American, Plaintiff is a member of a protected class, which satisfies the first element. Plaintiff has also demonstrated that an adverse employment action was levied against him in that he was demoted from his position of third shift supervisor.

---

4. Plaintiff appears to concede that he has no direct or indirect evidence of discrimination, as his Brief in Opposition to Defendant's Motion for Summary Judgment relies exclusively on the *McDonnell Douglas* scheme. (Pl.'s Br. Opp'n Def.'s Mot. Summ. J., at 14.)

In fact, Defendant admits that it demoted Plaintiff. Plaintiff has therefore satisfied the second element of his prima facie case. Finally, with respect to the fourth element, Plaintiff has alleged that after his demotion, the position of third shift supervisor was filled by an individual outside of the protected class, that is, a white female. When these facts are taken in the light most favorable to Plaintiff, the Court must conclude that Plaintiff has satisfied the first, second, and fourth elements of the *McDonnell Douglas* framework. *See generally Burdine*, 450 U.S. at 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 ("The burden of establishing a prima facie case of disparate treatment is not onerous.").

■ The third element of Plaintiff's prima facie case, that he demonstrate that he was meeting his employer's legitimate expectations, however, requires more discussion. Defendant maintains that Plaintiff cannot establish that he was meeting its legitimate expectations because of complaints that Plaintiff was unable to control the employees on the third shift. Defendant further notes that these complaints were corroborated by Mr. Calabro's observations when he entered the test floor during the third shift. Although Mr. Calabro's observations may provide some support for Defendant's contention that Plaintiff was failing to meet its expectations, other factors objectively suggest that Plaintiff was performing his job effectively. Specifically, the Court notes that once Plaintiff began his employment, he served as third shift supervisor for many months without incident. Approximately six months after Plaintiff became the third shift supervisor, Defendant began receiving general comments regarding inappropriate behavior during the third shift. After two employees complained that there were problems with the third shift, Mr. Myers spoke with Plaintiff and alerted him

to those alleged problems. According to all accounts, after Mr. Myers spoke with Plaintiff, the third shift operated as expected. Notably, the two individuals that originally complained about Plaintiff's effectiveness as a supervisor were among those that indicated that conditions on the third shift had significantly improved.

Plaintiff continued to serve as third shift supervisor without incident for several months until Mr. Calabro entered the test floor early one morning and allegedly saw that many of the test machines were not functioning and many of the operators were not at their work stations. Defendant, however, has offered no evidence regarding the number of test operators that were scheduled to work on the morning of Mr. Calabro's visit. Likewise, Defendant has offered no evidence regarding the reason that the test machines were malfunctioning, the number of repair technicians that were available to repair the machines, or the amount of time that the machines were inoperable. In fact, according to Mr. Myers, there was never an inquiry into the veracity of Mr. Calabro's alleged observations. (Myers Dep., at 71.) Notably, Plaintiff denies that a large number of the machines were down or that his employees were not carrying out their duties. This evidence suggests, then, that the situation observed by Mr. Calabro when he entered the test floor, to the extent it occurred as reported, may have been due to circumstances beyond Plaintiff's control. As such, this Court finds that there is a genuine issue of material fact with respect to whether Plaintiff was satisfying Defendant's legitimate work expectations. Accordingly, given that the facts must be construed in favor of Plaintiff whenever possible, Plaintiff's proffer of evidence to establish that he was meeting Defendant's legitimate expectations is sufficient to satisfy the final requirement of his prima facie case. Plaintiff's case,

therefore, withstands Defendant's Motion for Summary Judgment at this stage. *See generally Burdine*, 450 U.S. at 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 ("The burden of establishing a prima facie case of disparate treatment is not onerous."). Consequently, the Court will proceed with a consideration of Defendant's explanation for its actions as required under the *McDonnell Douglas* analysis.

■ Based upon an assumption that Plaintiff has established his prima facie case, the burden would then shift to Defendant to articulate a legitimate, nondiscriminatory basis for its action. *Gillins*, 148 F.3d at 415. The Court notes that Plaintiff has mischaracterized Defendant's burden, arguing that the basis for Plaintiff's demotion raised by Defendant, that is, Plaintiff's failure to maintain control over the third shift, was an illegitimate reason for his demotion. According to the *McDonnell Douglas* framework, however, Defendant's burden is one of production, requiring Defendant to merely proffer a legitimate reason for its employment decision. *See id.* In Defendant's Memorandum in Support of Motion for Summary Judgment, Defendant clearly states that it demoted Plaintiff because he could not control the employees on the third shift. (Def.'s Mem. Supp. Mot. Summ. J., at 6–7.) As maintaining supervision of a shift is an important element of a supervisor's job, the failure of a supervisor to control his subordinates is surely a legitimate basis for adverse employment action. Therefore, the Court finds that the reason proffered by Defendant sufficiently satisfies Defendant's burden of production, which requires it to articulate a legitimate, nondiscriminatory reason for the adverse employment action taken against Plaintiff.

Once Defendant's burden of production is satisfied, Plaintiff, in order to recover on his claim, is required to show that Defendant's proffered reason is a pretext for discrimination. *Gillins*, 148 F.3d at 415–16. In other words, Plaintiff must demonstrate that Defendant was actually and unlawfully motivated by race in its employment decision. *Id.* As evidence of pretext, Plaintiff notes that, to the extent there were problems on the third shift, after the June, 1999 meeting with Mr. Myers, Plaintiff gained control over the shift. Plaintiff also suggests that because Plaintiff was demoted after Defendant received a single email from Mr. Calabro, other motives besides Plaintiff's work performance must have been involved.

As further evidence of pretext, Plaintiff argues that there was racial tension present on the third shift. Specifically, Plaintiff notes that Ms. Batton and Mr. Cichowski identified two African–American employees, simply referred to as Kim and Angela, as the primary sources for the inappropriate behavior on the third shift. (Batton Dep., at 17–18.) According to Ms. Batton and Mr. Cichowski, Kim and Angela were responsible for playing loud rap music over the radio, which they found disagreeable. (*Id.*) Mr. Cichowski referred to it as the kind of music that "the black people listen to." (Cichowski Dep., at 26.) Also significant is a concern expressed by Ms. Batton that Plaintiff was often seen talking to Kim and Angela, the two previously mentioned African–American employees. Therefore, Plaintiff suggests that Defendant must have been motivated by the racial tension that was perceived to be exacerbated by the presence of an African–American supervisor. Plaintiff therefore contends that Defendant used Mr. Calabro's report only as a pretext to demote Plaintiff.

■ With respect to Plaintiff's evidence of pretext, the Court notes that Plaintiff's proof is not particularly strong. Nevertheless, taking the information available in

a light most favorable to Plaintiff, this Court finds that a reasonable jury could determine that Defendant's decision to demote Plaintiff was based upon the alleged racial tension created because of the type of music played and Plaintiff's contact with other African–American employees and not because of Plaintiff's alleged inability to effectively supervise the employees on the third shift. Accordingly, a genuine issue of material fact exists concerning Defendant's motivation in demoting Plaintiff, making summary judgment in favor of Defendant improper. Defendant's Motion for Summary Judgment [Document # 16] is therefore DENIED.

### B. Defendant's Motion to Strike

Pursuant to its Motion to Strike, Defendant seeks to have certain portions of Plaintiff's affidavit stricken, claiming that they are based either on hearsay or speculation, and therefore cannot serve in opposition to Defendant's Motion for Summary Judgment. The Court, however, has determined that the record, notwithstanding Plaintiff's affidavit, does not warrant summary judgment in favor of Defendant. Because Defendant's Motion for Summary Judgment is denied without considering Plaintiff's affidavit, Defendant's Motion to Strike [Document # 21] is now moot and is therefore DENIED.

### IV. CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment [Document # 16] and Defendant's Motion to Strike [Document # 21] are DENIED.

An Order consistent with this Memorandum Opinion will be filed contemporaneously herewith.