**William STOUT, Plaintiff,**

**v.**

**KIMBERLY CLARK CORP., Defendant.**

**No. 1:01CV173.**

United States District Court, M.D. North Carolina.

April 8, 2002.

B. Ervin Brown, II, Jonathan Mark Brooks, Moore and Brown, Winston–Salem, NC, for Plaintiff.

Alison Raney Bost, Womble Carlyle Sandridge & Rice Pdo 84, Winston–Salem, NC, Paul D. Caver, Jr., Powell Goldstein Frazer & Murphy, Atlanta, GA, Eric P. Berezin, Powell, Goldstein Frazer & Murphy, LLP, Atlanta, GA, for Defendant.

## MEMORANDUM OPINION

BEATY, District Judge.

This matter comes before the Court on two motions. Kimberly–Clark Corpora-

tion ("Kimberly–Clark" or "Defendant")[1] has filed a Motion for Summary Judgment [Document # 23] as to Plaintiff William Stout's ("Stout" or "Plaintiff") Complaint [Document # 1], which alleges violations of Title VII of the Civil Right Acts of 1964, 42 U.S.C. § 2000e *et seq.*, and wrongful termination under North Carolina common law. Also, Plaintiff Stout has filed a Motion to Strike the Supplemental Affidavit of Kenneth Kline [Document # 29]. For the reasons stated herein, Defendant's Summary Judgment Motion is GRANTED in part and DENIED in part and Plaintiff's Motion to Strike the Supplemental Affidavit of Kenneth Kline is DENIED as moot.

## I. FACTUAL BACKGROUND

Defendant operates a mill in Lexington, North Carolina ("Mill") that produces a variety of Kimberly–Clark's non-woven materials. (Stout Dep. at 55–56.) To operate the Mill's equipment, Kimberly–Clark hires hourly workers to assist in its production and converting departments. In the production department, the hourly workers monitor and operate the machines that actually manufacture the non-woven products. (Pl.'s Brief in Opp'n to Def.'s Mot. for Summ. J at 1 n. 1.) These machines are known as "base" or "Lex" ma-chines, and Kimberly–Clark operates three base machines—Lex–1, Lex–2, and Lex–3. After the Lex machines complete a product, the product is then delivered to the Mill's converting department, where hourly workers operate the machines that cut, wrap, and package the product before it is shipped to customers. *Id.* Despite the different functions of these machines, all hourly employees who operate the base and converting equipment are employed as Production Associates.

In order to best coordinate its production and converting departments, Kimberly–Clark utilizes High Performance Work Teams ("teams"). (Def.'s Mot. for Summ. J. Ex. A, Kenneth Kline Aff. ("Kline Aff.") ¶ 5, Stout Dep. at 65.) The hourly workers are divided into sixteen teams of seven to nine employees.[2] The teams are identified by the letters A–D, which indicate the particular 12–hour shift that a team works, and by the numbers 1–4, which indicate the machine or process that the team handles.[3] Accordingly, the A–3 team operates the converting equipment on A shift, and the B–4 team operates a particular production machine, Lex–3, on B shift. (Kline Aff. ¶ 6, Stout Dep. at 90.) In addition to these operational teams, which work twelve-hour shifts, Kimberly–Clark also employs a management team of employees

1. The Court notes that in Defendant's Notice of Removal, Defendant informed Plaintiff that the caption of Plaintiff's Complaint identified Kimberly–Clark incorrectly as "Kimberly Clark" without including the hyphen between Kimberly and Clark. (Def.'s Notice of Removal to U.S. District Court.) However, neither party has moved the Court to rectify this incorrect spelling and both Plaintiff and Defendant have continued to use "Kimberly Clark" as the caption. At this late point in the litigation proceedings and given the fact that Defendant has not objected prior to this point, the Court will also continue to utilize the incorrect spelling in Plaintiff's caption in order to ensure consistency.

2. When Stout joined Kimberly–Clark, the company only operated eight teams. At that time, Kimberly–Clark only ran two Lex machines, and the converting aspect was combined with the team that operated Lex–2. (Def.'s Brief Supp. Mot. for Summ. J. at 2 n. 5, Stout Dep. at 91.) In 1996 or 1997, Kimberly–Clark separated converting into its own team and also added a third machine, Lex–3, which then increased the total number of teams to sixteen. *Id.*

3. In greater detail, a "1" identified the base machine Lex–1, a "2" identified Lex–2, a "3" identified the converting equipment, and a "4" identified Lex–3.

who work a traditional five-day work week and who have oversight control of all operations.

As part of the team concept, each team is responsible for many of the employment-related issues that affect its members, including hiring, attendance, training, and discipline. *Id.* The team discusses and resolves most of these issues as a team but, in order to effectively resolve the discipline situations, each team selects members for a sub-group called the Peer Development Group ("PDG"). (Kline Aff. ¶ 7.) Whenever a discipline issue or problem is brought to the team, the team's PDG investigates the situation and then recommends a course of action to the entire team. *Id.* After receiving the PDG's recommendation, the ultimate disciplinary decision is made by the team as a whole.

When discipline is warranted, Kimberly–Clark provides the teams with several different disciplinary tools to correct their team members' behavior or performance. These options include one-on-one conversations, verbal or written warnings, corrective action plans ("CAP"), decision-making leave ("DML"), leave without pay, or discharge. *Id.* Two of these terms, CAP and DML, require greater explanation. According to Kimberly–Clark's Mill Practices Guidelines, a CAP is described as "a written plan detailing specific steps for correcting one's behavior so that it is returned to a satisfactory level of performance. Input on the contents of a CAP may come from a variety of sources, including the individual, the team, the team's PDG and management." (Def.'s Brief Supp. Mot. for Summ. J. Ex. B., Mill Practices Guidelines—Performance Manage-

ment System at 2.) In contrast, a DML is defined as

> a formal method of resolving performance trends and/or serious acts that do not meet performance expectations. When an employee is placed on DML, he/she receives a paid leave of absence on a scheduled work day so he/she has the time to develop a personal list of corrective actions deemed necessary to ensure continued employment. This leave of absence may be assigned either on-site or off-site. Failure to submit an acceptable plan at the conclusion of the DML may result in further disciplinary action, up to and including termination.

*Id.* It was Plaintiff's understanding that, if an employee did not satisfactorily complete the DML and the accompanying plan, the employee would be terminated from his employment. (Stout Dep. at 123.) Although this system authorizes the team to handle its own discipline, Kimberly–Clark asserts that the management team may intervene in the disciplinary process at any time. (Kline Aff. ¶ 7.)

Plaintiff Stout is a white male who worked at the Mill from the summer of 1992 until December 6, 1999. (Stout Dep. at 55–56.) In February of 1993, Kimberly–Clark hired Stout as a full-time Production Associate. At all times of his employment, Stout had worked on the A team operating the converting equipment, and since 1996 Stout had served as a member of the A–3 team.[4] *Id.* at 82–83. Despite his focus on the converting equipment, Stout occasionally operated and received training on the various Lex machines used by Kimberly–Clark. *Id.* at 84–85.

In 1995 and 1996, Stout was involved in two incidents that led his team to take

---

4. From the start of Stout's employment until 1996, the converting functions were performed, in addition to the Lex–2 operations, by the "2" teams. Accordingly, Stout was a member of A–2 until 1996, but even on A–2 he worked almost exclusively on the converting equipment. (Stout Dep. at 82–84.)

disciplinary action towards him. The first situation arose in 1995, when Stout improperly bypassed a safety switch on a piece of equipment, an act which violated Kimberly–Clark's safety procedures. As a result, the A–3 team placed Stout on a DML and established a CAP that Stout successfully completed. The second incident occurred in 1996, when Stout utilized a company computer to access personal information over the Internet, in violation of company policy. The A–3 team again addressed the incident and prescribed a CAP that Stout successfully followed. Documents noting both of these disciplinary incidents were placed in Stout's employment file. *Id.* at 126, 128.

In 1999, Stout learned of a Production Associate vacancy on the B–4 team, created when an African–American woman resigned from her position. *Id.* at 162. As explained above, the B–4 team operated the Lex–3 machine and worked on a different shift than the A–3 team, but the B–4 Production Associate position offered the same hourly rate, seniority, and other benefits as Stout's current position. Stout learned of the position by viewing it on the employees' bulletin board, a location where Kimberly–Clark posted vacancies internally for ten days before opening the positions to outside applicants. The position listing included a general description of the qualifications necessary.[5]

After learning of the B–4 position, Stout decided to submit his name for consideration for the vacancy. In his deposition, Stout explained that he was interested in the B–4 position because of difficulties he had encountered in working with Dan Heaton ("Heaton"), a member of the management team and the operation consultant for the converting teams, including the A–3 team. (Stout Dep. at 163.) In a later affidavit attached to his Brief in Opposition to Defendant's Motion for Summary Judgment, Stout asserted that he also believed that if he transferred to a B–4 team position, he could increase his opportunities for promotion to a salaried position with the company. (Stout Aff. ¶¶ 6–8.) More specifically, he asserted that one salary position, that of planner, required significant experience on a base machine, and that the B–4 position would give him the necessary base machine experience. *Id.* ¶ 6. He also asserted that base machine experience would allow him to be selected for "special projects" that could lead to a salaried position. *Id.* ¶ 7. Furthermore, Stout also asserted that the B–4 position would provide greater job security because the converting teams were being downsized. *Id.* ¶ 8.

Initially, Stout and two other employees, Danny Craig Smith ("Smith") and Chris Foster ("Foster"), were interested in the B–4 vacancy and all three submitted their names for consideration. Shortly afterward, however, Smith and Foster withdrew their names. According to Smith, he and Foster withdrew their applications after a member of the B–4 team, Leonard Bruff, informed them that the B–4 team might interview all three applicants but would probably hire a temporary employee

---

5. The job listing stated:
    To be considered for this position, you must meet the following criteria:
    Excellent communications, training and troubleshooting skills. Proven record of involvement in process and team involvement. Ability to write necessary work instructions and make changes to operating procedures as required for training and ISO. Has not been on a CAP or any plan in the past 12 months. Is currently within mill attendance guidelines. Has demonstrated a consistent track record around safety performance. Has good mechanical aptitude. Base machine experience a plus. (Def.'s Brief Supp. Mot. for Summ. J. Ex. D, Production Associate Listing.)

who had worked with the B–4 team for six months. (Smith Dep. at 16–20.) Although Bruff did not name the temporary employee by name during his conversation with Smith and Foster, the employee was later identified as Sean Henderson, an African American male.[6] *Id.* Upon learning this information, Smith and Foster withdrew their names from consideration, leaving Stout as the only internal employee who had demonstrated interest in the position. *Id.* at 29.

Shortly after Stout communicated his interest in the vacancy, the B–4 team members met and considered his qualifications. (Mark Crowell Dep. at 84–87; Karen Tysinger Dep. at 24; Herbert Wright Dep. at 16–20.) In addition to comparing Stout's background with the qualifications listed on the original vacancy posting, however, the B–4 team developed their own criteria. (Crowell Dep. at 54–55, 102–05.) To determine this criteria, the team evaluated its cumulative strengths and weaknesses in several areas, including flexibility, team orientation, leadership skills, personal sensitivity, initiative, verbal skills, decision-making abilities, and cross-functional team participation. *Id.* The team then rated Stout in these same areas, in order to determine if he had strengths that could counterbalance the team's perceived weaknesses. After this evaluation, the B–4 team decided not to interview Stout for the position. (Leonard

Bruff Dep. at 36–38; Crowell Dep. at 116–17.)

One of the members of the B–4 team, Karen Tysinger, then informed Stout via email on September 24, 1999 that he was not selected for the position. (Stout Dep. Ex. 10.) Unsatisfied with this response, Stout requested clarification and additional information. *Id.* In a later September 28, 1999 communication, the following reasons were given by the B–4 team as to why Stout was not interviewed for the position: Stout's lack of training and experience on the base machine Lex–3, his prior safety and policy violations, and some team members' concerns regarding Stout's ability to meet the team's needs and to fit into the team dynamic. (Def.'s Brief Supp. Motion for Summ. J. Ex. E, Kendra Bean September 28, 1999 email.) More specifically, the B–4 team cited his 1995 and 1996 safety and policy violations as well as other safety issues, negative feedback from the B-shift converting team, current issues such as problems with management, problems with other teams, manipulation of "Mikon" numbers, "unauthorized comp. material," "unauthorized Internet Home Page development", and his history of sleeping on the job. *Id.* As to his inability to fit into the team's dynamics, the B–4 team in their email communication stated that Stout was "argumentative and hard to get along with; not flexible—not a team player." [7] *Id.* On

---

6. In addition to this incident, Stout has presented to the Court additional proof that he asserts demonstrates Kimberly–Clark's unlawful consideration of race in making various hiring and promotional opportunities affecting other employees. This purported evidence consists of what Stout contends is an improper consideration of race based upon an alleged quota system. Any greater discussion about this argument is not necessary, however, because of the Court's determination that Plaintiff has not demonstrated that he suffered an adverse employment action, which is an "absolute precondition to suit" under Title

VII. *Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986).

7. Kimberly–Clark asserts that this opinion of Stout's interpersonal skills was gleaned from several B–4 team members' interactions with and observations of Stout. (Bruff Aff. ¶ 4; Crowell Aff. ¶ 4; Don Feezor Aff. ¶ 4; Cecila Hedrick Aff. ¶ 4; David Staten Aff. ¶ 4; Tysinger Aff. ¶ 4; Wright Aff. ¶ 4.) However, Stout challenges the team members' basis of knowledge, arguing that the depositions of

October 5, 1999, Kimberly–Clark's Human Resources manager, Kenneth Kline ("Kline"), met with Stout to explain these reasons for the team's decision. (Kline Aff. ¶ 10.) Ultimately, Sean Henderson was hired for the vacant B–4 position.

Two days after Stout met with Kline to discuss the reasons he did not receive an interview for the B–4 vacancy, Stout became involved in another controversy that ultimately led to his termination. On October 7, 1999, Kimberly–Clark asserts that Stout had violated its safety policies during his shift. On that day, David Wang ("Wang"), another member of the management team, observed Stout, while on-duty, lying on a table near a converting machine with his elbows propping his shoulders up, his eyes closed, his chin tucked towards his chest, and his lower legs hanging off the table. (Stout Dep. Ex. 15, Wang e-mail.) At the time of the occurrence, Stout was operating a machine that required the employee to insert a new role of packaging every thirty minutes. (Stout Dep. at 200.) Stout agrees with this description of his posture but denies that he was sleeping or otherwise not aware of his surroundings. (Stout Dep. at 198.) Instead, Stout asserts that he was briefly resting in order to relieve the muscle soreness in his legs and back and that, while in this position, he opened his eyes periodically to ensure the proper functioning of the machine. *Id.* at 201–02. Stout had never been told by the Kimberly–Clark management that such behavior was unacceptable, and he equated it to reading a newspaper, an activity that he asserts the company permitted employees to do while operating the machines. *Id.*

After receiving notice of this incident, Heaton forwarded the information to the

several team members demonstrate that they did not have personal knowledge of any deficiencies in Stout's interpersonal skills.

A–3 PDG group, who began an investigation. The A–3 team ultimately determined that no discipline was necessary based on the evidence collected by the PDG, because the evidence did not demonstrate that Stout had been actually asleep. (Gardner Dep. at 30–33; Stout Dep. at 211, Heaton Aff. ¶ 5.) This evidence included statements from another team member who was present at the area of the incident and who disputed Wang's assertion that Stout was sleeping or otherwise unaware of his surroundings. (Larry Shoaf Dep. at 25–27.) Disagreeing with the team's decision, Heaton instructed the team to hold an off-site meeting to create a development plan for the team and a development plan for Stout's inattentive behavior. (Stout Dep. at 241–42, Ex. 16, Stout Summary of Events, ¶ 24.) Holding this meeting on November 12, 1999, the team created a team development plan but found no cause to form a development plan for Stout. *Id.* Ex. 16 ¶ 28. On November 19, 1999, Heaton and several other management team members met with the A–3 team, and informed the team that management would be handling the issue of Stout's inattentive behavior from that point forward. Furthermore, the management team informed the team members that the entire A–3 team would be placed on a CAP based on the team's failure to recognize the seriousness of Stout's inattentive behavior. *Id.* Ex. 18 ¶ 30. On this same date, November 19, 1999, Heaton asserts that the management team met and decided to place Stout on a DML, which would require Stout to submit a DML plan. (Heaton Aff. ¶ 5.) When this decision was made, Kimberly–Clark asserts that it did not yet know that Stout had earlier filed a United States Equal

(Wright Dep. at 23–24; Crowell Dep. at 85–89; Tysinger Dep. at 37–41.)

Employment Opportunity Commission ("EEOC") questionnaire on November 15, 1999 related to his failure to receive the B–4 position. On November 22, 1999, Kimberly–Clark learned of the EEOC action when Stout placed a copy of the EEOC general intake questionnaire in Heaton's company in-box. (Stout Aff. ¶¶ 11 & 12.)

It was not until November 30, 1999 that Stout received any further information regarding the October 7, 1999 inattentive behavior incident. On that date, Stout alleges that after a management team meeting, Heaton informed Stout that he and Stout would meet the following day to discuss a corrective action plan ("CAP") for Stout's inattentive behavior. (Stout Dep. at 260, Ex. 16 ¶ 33.) On December 1, 1999, Heaton and other members of the management team informed Stout that he was being placed on a DML, as opposed to a corrective action plan, and offered suggestions as to what Stout should include in the necessary written DML plan that he needed to complete. (Heaton Aff. ¶ 7, Stout Dep. at 260–62.) Stout was given the remaining portion of the day off with pay so that he could prepare the plan. *Id.* However, Stout did not bring in the DML plan on the next day, December 2, 1999, because he notified Kimberly–Clark that he was sick and could not come to work. (Stout Dep. at 263.) The following day, December 3, 1999, Heaton and other management team members requested a meeting with Stout in order to review his DML plan. At that time, Stout informed him that he was refusing to prepare a DML action plan, based on his attorney's written recommendation that submitting the DML would in effect be admitting the unfounded charges of inattentive behavior and would

jeopardize his EEOC complaint. (Heaton Aff. ¶ 7.) The management team then informed Stout that he was to leave Kimberly–Clark's premises immediately and return on Monday, December 6, 1999, with a DML plan. (Stout Dep. at 265, Ex. 18 Kimberly–Clark Summary of 12/3/99 Stout Discussion.) Stout left this meeting with the understanding that if he returned without a DML plan on December 6, 1999, he could be terminated. *Id.* at 265. Stout asserted that at this point he believed his employment would be terminated within a short period of time regardless of whether he completed the DML plan, but that if he submitted a DML plan on December 6, 1999, he would not have been terminated on that day. *Id.* at 267–68. Stout did return on December 6, 1999, but without a completed DML plan, and Kimberly–Clark terminated Stout's employment on that day. (Heaton Aff. ¶ 8; Stout Dep. at 266.)

Based on these facts, Stout brought suit against Kimberly–Clark, alleging that he had been denied the B–4 team position because of his race and that his December 6, 1999 termination had been in retaliation for his EEOC complaint, in violation of Title VII. 42 U.S.C. § 2000e–3(a). Stout also asserts a cause of action for wrongful termination under North Carolina common law and requests that punitive damages be awarded as a remedy for this state law violation.[8] Challenging Stout's Complaint in its entirety, Kimberly–Clark now requests summary judgment in its favor.

## II. DISCUSSION OF DEFENDANT'S SUMMARY JUDGMENT MOTION

### A. Standard of Review

Summary judgment is appropriate when "there is no genuine issue as to any mate-

---

8. Although this case originated in the Superior Court of Forsyth County, North Carolina, Kimberly–Clark removed the case to federal court based on the existence of both subject-matter and diversity jurisdiction. Accordingly, the Court has proper jurisdiction over the entire case and controversy.

rial fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). Under this standard, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A motion for summary judgment should not be granted " 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.' " *Campbell · v. Hewitt, Coleman & Assocs., Inc.,* 21 F.3d 52, 55 (4th Cir.1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.,* 381 F.2d 245, 249 (4th Cir.1967)).

When ruling on a summary judgment motion, the Court views the evidence in the light most favorable to the non-moving party, according that party the "benefit of all reasonable inferences." *Bailey v. Blue Cross & Blue Shield of Va.,* 67 F.3d 53, 56 (4th Cir.1995), *cert. denied,* 516 U.S. 1159, 116 S.Ct. 1043, 134 L.Ed.2d 190 (1996). Nevertheless, the non-moving party cannot rely solely on unsupported assertions to demonstrate that a genuine issue of material fact exists. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 212. Judges are not " 'required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party.' " *Id.* at 251, 106 S.Ct. at 2511, 91 L.Ed.2d at 213 (quoting *Schuylkill & Dauphin Improvement Co. v. Munson,* 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867, 872 (1871)). Summary judgment is therefore warranted when the nonmoving party "fails to make a· showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex· Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

## B. Plaintiff Stout's Disparate Treatment Claim

Stout's first cause of action asserts disparate treatment in violation of Title VII. Because the record does .not present any direct evidence of Kimberly–Clark's alleged discriminatory motive, Stout must follow the *McDonnell Douglas* burden-shifting scheme. *Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 278 (4th Cir.), *cert. denied,* 531 U.S. 875, 121 S.Ct. 181, 148 L.Ed.2d 125 (2000); *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas,* the plaintiff first bears the burden of establishing a prima facie case by demonstrating that (1) he is a member of a protected class, (2) he suffered an adverse employment action, (3) he was qualified for the position, and (4) the adverse employment action occurred under circumstances which create an inference of unlawful discrimination. *Carter v. Ball,* 33 F.3d 450, 458 (4th Cir.1994).

After the· plaintiff sufficiently demonstrates a prima facie case of employment discrimination, then the employer must respond by producing evidence that it acted for a legitimate, nondiscriminatory reason. *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). If the employer satisfies this burden of production, then the presumption of unlawful discrimination created by the plaintiff's prima facie· case disappears. *Brinkley,* 180 F.3d at 607. The plaintiff at this point must prove that the reason proffered by the employer is a

mere pretext for discrimination. *Murrell,* 262 F.3d at 257. Under the *McDonnell Douglas* framework, the plaintiff at all times bears the ultimate burden of persuasion with respect to the employer's alleged unlawful discrimination. *Id.* at 253, 101 S.Ct. at 1093, 67 L.Ed.2d 207.

■ While there is a dispute among the parties as to whether Stout can satisfy the prima facie elements, the Court finds that there is particular merit in Kimberly–Clark's assertion that the refusal to interview or select Stout for the B–4 team position does not qualify as an adverse employment action because it was a lateral transfer. Stout disputes Kimberly–Clark's characterization, asserting that the B–4 team position offered increased opportunities for promotion, and thus Kimberly–Clark's refusal to interview him for this position qualifies as an adverse employment action.

An adverse employment action is defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 2269, 141 L.Ed.2d 633 (1998). When an employment action does not significantly affect "job duties, compensation, or benefits," the action does not qualify as adverse and thus cannot support a Title VII claim. *Hunt v. Rapides .Healthcare Sys., LLC,* 277 F.3d 757, 769 (5th Cir.2001). Accordingly, lateral transfers do not constitute an "adverse employment action" for purposes of Title VII. *See Boone v. Goldin,* 178 F.3d 253, 256 (4th Cir.1999) ("[W]e conclude that reassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect on her."); *Sanchez v. Denver Pub. Sch.,* 164 F.3d 527, 532

(10th Cir.1998) (holding that a school district's refusal to transfer a teacher into a different position "involving at most an insignificant alteration in job responsibilities" did not qualify as an adverse employment action under either Title VII or ADEA).

Determining whether a current employee's request for another position within the company should be classified as a request for a lateral transfer or a promotion is an objective determination. *Doe v. Dekalb County Sch. Dist.,* 145 F.3d 1441, 1448–50 (11th Cir.1998); *Sanchez,* 164 F.3d at 532 n. 6. To make this decision, the Court can consider evidence of each position's benefits, conditions, and privileges, including salary, work responsibilities, and opportunities for promotion. *See, e.g., Boone,* 178 F.3d at 255–56 (stating that a significant change in working conditions and a decreased opportunity for future promotions are appropriate factors for consideration); *Watts v. Kroger Co.,* 170 F.3d 505, 512 (5th Cir.1999) ("We have held, along with many of our sister circuits, that employment actions are not adverse where pay, benefits, and level of responsibility remain the same."); *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.,* 993 F.2d 132, 136 (7th Cir.1993) (stating, in an ADEA case, "[a] materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation"). However, the differences between the two positions must be demonstrated through objective facts and not merely the plaintiff's subjective values or perceptions of either position. *See Boone,* 178 F.3d at 256 (holding that reassignment was not an adverse action even though the plaintiff asserted that the new position was

more stressful and had poor working conditions); *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 457 (7th Cir.1994) (specifying that plaintiff's perception that a reassignment was "personally humiliating" was insufficient, without more, to establish an adverse employment action). Plaintiff's forecast of evidence must demonstrate some objective proof that the two positions differ in a substantial way.

Several considerations about the B–4 team position indicate that Stout's application for this position was a request for a lateral transfer and not a promotion opportunity. Both the B–4 position and Stout's A–3 position have the title "Production Associate," and both offer the same hourly rate of pay and the same benefits. Furthermore, Kimberly–Clark asserts that working in the B–4 team would not have improved Stout's opportunities for promotion, overtime, or salary increases. (Kline Aff. ¶ 11.) However, these similarities by themselves do not guarantee that the two positions are in fact equal, because the Court must also consider the other non-tangible aspects of employment, such as prestige and job responsibilities. *Flaherty*, 31 F.3d at 456–57.

The record presented to the Court establishes two objective differences between the positions, which the Court will evaluate in turn to determine if these differences present an issue of fact as to whether the A–3 position was in fact equivalent to the B–4 position or instead represented a position of promotion. First, the positions involve different shifts such that the actual days and hours worked by each team would vary. However, "merely changing [a plaintiff's] hours, without more, does not constitute an adverse employment action." *Benningfield v. City of Houston*, 157 F.3d 369, 377 (5th Cir.1998); *Craven v. Texas Dept. of Criminal Justice—Institutional Div.*, 151 F.Supp.2d 757, 768 (N.D.Tex. 2001).

Second, the two positions involved different equipment: the A–3 team operated the converting equipment, while the B–4 team operated a base machine, Lex–3. However, different work does not by itself demonstrate that one position is objectively better or worse than the other. *Boone*, 178 F.3d at 256. Instead, the job responsibilities must be significantly different so as to change the working conditions. *Id.* For example, the Fourth Circuit has found that an electrical engineer's reassignment from a laboratory position to a wind tunnel facility position was not adverse, even though the new position had unfamiliar duties and stringent deadlines. *Id.* Similarly, the Seventh Circuit determined that a pharmaceutical salesperson did not suffer an adverse employment action when his employer transferred him into a different division with different products because the change was only a "minor change in working conditions." *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir.1996). In this instance, although the two positions centered around different equipment, they both involved operating machinery and they both required that the employee function as part of a team. As such, the Court finds that Stout has not suffered an adverse employment action simply because the B–4 position would provide an opportunity for him to work on a different machine.

Stout, however, argues that the B–4 position does have significant advantages in its working conditions over the A–3 position. In an affidavit attached to his Response, Stout asserts that he believed that promotions to salaried positions and special project assignments were more likely for hourly employees who worked on a base machine like the Lex–3. (Stout Aff. ¶¶ 6–7). Furthermore, Stout asserts that

the B–4 team was less susceptible to corporate downsizing. *Id.* ¶ 8. However, Stout must forecast some evidence establishing this fact beyond his own opinion. As mentioned above, an employment action must be considered adverse on an objective, not a subjective, standard. Although Stout's affidavit states his beliefs in conclusory terms that read as fact, the statements only present his personal opinion as to the benefits of the B–4 position. Stout's subjective opinion that the B–4 position was a substantial improvement over his current position does not suffice to demonstrate that the position was more than just a lateral transfer. *See, e.g., Forsyth,* 91 F.3d at 774 (holding that "a plaintiff's subjective perception" must be supplemented by evidence that an involuntary transfer was in fact a demotion). Stout does not corroborate his opinion with any other proof, such as statistics demonstrating the numbers of base machine workers promoted to salaried positions or statements from other employees confirming that the B–4 position was more prestigious. Accordingly, without support, Stout's affidavit does not establish a material issue of fact as to whether the denial of his application for a transfer to the B–4 team constituted an adverse employment action.

In summary, the Court has not been presented with any objective evidence that the B–4 position provided any advantages over Stout's A–3 position. Without such a showing, the B–4 vacancy for which Stout applied is classified as a lateral transfer, and a denial of a lateral transfer does not equate to an adverse employment action. As previously mentioned, the adverse employment action requirement is an absolute precondition to a claim under Title VII. *Bristow,* 770 F.2d at 1255. The Court therefore finds that Stout has failed to establish an essential element of a prima facie case necessary to show actionable discrimination. The Court therefore concludes that summary judgment in Defendant's favor is appropriate as to this claim of discrimination.[9]

### C. Plaintiff Stout's Retaliation Claim

Kimberly–Clark also challenges Stout's claim that his termination was an act of retaliation for Stout's EEOC complaint regarding the B–4 team's refusal to interview him for the B–4 vacancy. Title VII provides a private cause of action when an employee experiences an adverse employment action "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). As previously noted, in order to demonstrate the elements of this cause of action, a plaintiff can either utilize the traditional rules of proof and present direct evidence as to the employer's discriminatory intent, or the plaintiff can proceed under the *McDonnell Douglas* modified scheme of proof. *See, e.g., Kubicko v. Ogden Logistics Servs.,* 181 F.3d 544, 552 (4th Cir. 1999); *Smith v. First Union Nat'l Bank,* 202 F.3d 234, 248 (4th Cir.2000) ("The *McDonnell Douglas* burden-shifting scheme applies in analyzing retaliation claims under Title VII."). Stout does not present any direct evidence and therefore

---

**9.** In light of the Court's decision granting summary judgment to Defendant because Plaintiff has not suffered an adverse employment action, it is not necessary for the Court to reach Defendant's remaining arguments that summary judgment is warranted because of other deficiencies in Plaintiff's prima facie case and in his proof that Defendant's reasons for denying him an interview were pretextual.

must rely on the *McDonnell Douglas* framework to establish his case.

Under *McDonnell Douglas*, the initial burden falls on the plaintiff to demonstrate a prima facie case of retaliation by showing: (1) he engaged in protected activity, (2) the employer took adverse action against him, and (3) there was a causal connection between the activity and the adverse action. *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 443 (4th Cir. 1998). Once the plaintiff presents this prima facie case, then the burden shifts to the employer, who must "produce a legitimate nondiscriminatory reason for the adverse action." *Karpel v. Inova Health Sys. Serv.*, 134 F.3d 1222, 1228 (4th Cir.1998). If the employer meets its burden of production, the plaintiff then bears the ultimate burden of proving retaliation by showing that the employer's proffered reason is pretextual. *Id.; Rhoads v. F.D.I.C.*, 257 F.3d 373, 392 (4th Cir.2001), *cert. denied*, ── U.S. ──, 122 S.Ct. 1309, ── L.Ed.2d ──, 2002 WL 407288 (2002). Although the burden of production shifts during the implementation of this framework, the burden of persuasion at all times remains on the Plaintiff.

■ In support of its Motion, Kimberly–Clark again asserts that Stout cannot establish an essential element of his prima facie case for his retaliation claim. Kimberly–Clark, however, does not dispute that Stout's filing of an EEOC Complaint is a protected activity or that a termination from employment is an adverse employment action. What Kimberly–Clark does challenge is Stout's ability to demonstrate

a causal connection between the activity and the adverse employment action. Stout maintains that the temporal proximity of the protected activity and the adverse employment action—his termination—establishes a causal connection. In considering Stout's argument, the Court notes that the prima facie case is "a relatively easy test" that does not place a heavy burden on the plaintiff. *Young v. Lehman*, 748 F.2d 194, 197 (4th Cir.), *cert. denied*, 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 489 (1985). When a plaintiff is discharged shortly after he engages in protected activity, the evidence is sufficiently suggestive of retaliation to satisfy the causation requirement of a prima facie case. *Rhoads*, 257 F.3d at 394. Stout argues that the following scenario occurred: he informed the employer of his EEOC complaint on November 22, 1999, he was informed that Kimberly–Clark was placing him on a DML on December 1, 1999, and then he was terminated on December 6, 1999.[10] While Defendant argues that it had actually made the decision to place Stout on the DML on November 19, 1999, before it learned of Stout's complaint, Stout relies on the fact that he was not informed of the decision to place him on a DML until December 1, 1999, nine days after Kimberly–Clark learned of the EEOC complaint. Accordingly, when Stout's proof is given the benefit of all reasonable inferences, the fact that he was informed of the DML disciplinary action shortly after he informed Kimberly–Clark of his EEOC complaint demonstrates a causal connection sufficient to establish his prima facie case.

10. The Court notes that while Stout asserts that December 1, 1999 was the day he learned that he would be placed on a DML, a summary of events prepared by Stout lists November 30, 1999 as the day that Heaton scheduled the December 1, 1999 meeting with Stout to "go over his corrective action plan." (Stout Dep. Ex. 16.) Given that both of these events occurred after Kimberly–Clark learned of Stout's EEOC complaint and that a corrective action plan is a less serious form of discipline than a DML, the Court will use December 1, 1999 as the date that Stout learned that the management team intended to discipline him by requiring a DML.

At this point, Kimberly–Clark asserts, as their non-discriminatory reason, that Stout was terminated because he failed· to complete the DML plan that the company required based on the October 7, 1999 inattentive behavior incident. Kimberly–Clark asserts that it required the DML plan based on Wang's observance of Stout's inattentive behavior, and that Stout knew that termination is a potential consequence when an employee fails to complete the DML plan. Furthermore, Kimberly–Clark again asserts that it made the decision to place Stout on a DML before it learned of Stout's EEOC complaint. Because disciplining an employee for inattentive and insubordinate behavior is a non-discriminatory reason, Kimberly–Clark has established its burden of production. *See, e.g., Scroggins v. Univ. of Minnesota*, 221 F.3d 1042, 1045 (8th Cir.2000) (finding that defendant's belief that the plaintiff had been sleeping on the job presented a non-discriminatory reason for the plaintiff's termination).

Once Defendant's burden of production is satisfied, Plaintiff, in order to recover on his claim, is required to present proof demonstrating that Defendant's proffered reason is pretextual. *Rowe v. Marley Co.*, 233 F.3d 825, 829–30 (4th Cir.2000). In order to meet his burden, Stout again relies on the timing, noting that Kimberly–Clark did not inform him of the decision to place him on the DML until December 1, 1999, 12 days after Kimberly–Clark alleges that they made the decision and nine days after the company learned of Stout's EEOC complaint. Stout further asserts that his termination was retaliatory by providing evidence questioning the motive of Kimberly–Clark's decision to place him on a DML. In greater detail, Stout relies on the fact that, although typically the teams disciplined their own members, Kimberly–Clark chose to disregard the decision of the A–3 team that Stout should not be disciplined for the October 7, 1999 incident and instead placed him on a DML, a relatively severe form of discipline. Stout also·asserts that the management team stopped enforcing the ·A–3 team's CAP, imposed by the management team because of the A–3 team's refusal to discipline Stout, after Stout was terminated. (Shoaf Dep. at 20.)

Viewing this evidence in the light most favorable to Plaintiff, the Court finds that close temporal proximity between the filing of Stout's EEOC complaint and the adverse employment action, in addition to the circumstances·surrounding Kimberly–Clark's requirement that Stout submit the DML plan contrary to the A–3 team's recommendation, present an issue of fact as to whether Kimberly–Clark's decision to terminate Stout was pretextual. Accordingly, Kimberly–Clark's Motion for Summary Judgment is DENIED as to Stout's Title VII retaliation claim.

### D. Plaintiff's Claim of Wrongful Termination and Request for Punitive Damages

In addition to Plaintiff's two Title VII claims, Plaintiff also alleges a claim of wrongful termination and punitive damages under North Carolina common law. Although in general, North Carolina does not recognize an action for wrongful discharge by an at-will employee, the state courts have established a limited exception when a plaintiff's employment is terminated "for an unlawful reason or purpose that contravenes ·public policy." *Coman v. Thomas Mfg. Co., Inc.*, 325 N.C. 172, 175, 381 S.E.2d 445, 447 (1989) (quoting *Sides v. Duke Univ.*, 74 N.C.App. 331, 342, 328 S.E.2d 818, 826 (1985), *abrogated on other grounds, Kurtzman v. Applied Analytical Indus.*, 347 N.C. 329, 493 S.E.2d 420 (1997)). Public policy is defined in general terms "as the principle of law which holds that no citizen can lawfully do that which

has a tendency to be injurious to the public or against the public good." *Coman,* 325 N.C. at 175 n. 2, 381 S.E.2d at 447 n. 2. The boundaries of the public policy exception are not clearly defined, but "[a]t the very least public policy is violated when an employee is fired in contravention of express public policy declarations contained in the North Carolina General Statutes." *Amos v. Oakdale Knitting Co.,* 331 N.C. 348, 353, 416 S.E.2d 166, 169 (1992). Stout has not presented the Court with any North Carolina court decision that has ruled that a discharge as retaliation for an employee's protest of the employer's discriminatory activities violates the state's public policy. Accordingly, the Court joins the other federal district courts who have found no public policy exception for retaliatory discharge and finds that Plaintiff cannot establish this element of the cause of action. *See, e.g., Curran v. First Union Mortg. Corp.,* 1997 WL 907909, *2 (E.D.N.C. March 24, 1997); *Mullis v. Mechanics & Farmers Bank,* 994 F.Supp. 680, 688 (M.D.N.C.1997); *Chung v. BNR, Inc./Northern Telecom, Inc.,* 1997 WL 905520, *2 (E.D.N.C. Oct. 20, 1997).

█ As a result of the Court's ruling on his wrongful termination claim, Stout's claim for punitive damages also cannot survive summary judgment, for "[p]unitive damages may not be awarded unless otherwise a cause of action exists and at least nominal damages are recoverable." *Mehovic v. Mehovic,* 133 N.C.App. 131, 135–36, 514 S.E.2d 730, 733 (N.C.App.1999) (citations omitted). Summary judgment is therefore granted for Kimberly–Clark as to all of Plaintiff's state law claims.

## III. DISCUSSION OF PLAINTIFF STOUT'S MOTION TO STRIKE

As a final matter, the Court will now address Plaintiff's Motion to Strike [Docu-

ment # 29] in which he requests that the Court strike the Reply affidavit of Kenneth Kline ("Reply affidavit"). Although Kimberly–Clark had previously submitted one affidavit from Kline as part of the exhibits for its Motion for Summary Judgment,[11] the company also submitted a supplemental affidavit from Kline to the Court as Exhibit A of its Reply in Support of its Motion for Summary Judgment [Document # 28]. Stout argues that the Rules of Federal Procedure ("Rules") do not allow Kimberly–Clark to include this second Kline affidavit as an attachment to a Reply. As the Court has not relied on the Reply affidavit in reaching its decision to grant summary judgment, Stout's Motion is denied as moot.

## IV. CONCLUSION

As discussed above, Defendant's Motion for Summary Judgment is DENIED as to Plaintiff's claim of retaliatory termination in violation of Title VII. Defendant's Motion for Summary Judgment is GRANTED as to Plaintiff's claim of racial discrimination in violation of Title VII based on Defendant's denial of Plaintiff's 1999 application for an available vacancy. Defendant's Motion for Summary Judgment is also GRANTED as to Plaintiff's claim of wrongful termination and Plaintiff's claim for punitive damages. Also, Plaintiff's Motion to Strike the Supplemental Affidavit of Kenneth Kline is DENIED as moot.

An ORDER consistent with this Memorandum Opinion will be entered contemporaneously herewith.

---

**11.** The Court notes that any citation within this Memorandum Opinion to the "Kline Affidavit" refers to the unchallenged first Kline affidavit and not the Reply affidavit.